(Decided July 29th, 1859.)

# Wm. C. Reddall *vs.* Wm. H. Bryan and Others.

Digging deep holes and planting therein large stone pillars or abutments, digging and carrying away large banks of valuable clay, and constructing an aqueduct by ditches and embankments through, and thus permanently dividing the complainant's land, are acts which, if done without authority of law, would present a case of irreparable damage, authorizing the interference of a court of equity by *injunction.*

The right to an injunction is not *ex debito justitiæ,* but the application is addressed to the sound conscience of the chancellor acting upon all the circumstances belonging to each particular case.

The chancellor has the right to require a full and candid disclosure of all the facts, and if there appears in the proceedings sufficient to show that this has not been made, he may properly refuse to grant an injunction.

The Constitution of this State declares that, "The Legislature shall enact no law authorizing private property to be taken for *public use* without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation." HELD:

1st. That these words are *mandatory*, both as to the *use* for which private property may be taken and the previous payment or tender of compensation therefor: it can be taken only for *public use*.

2nd. But the words, "*public use*," do not mean merely a use of the government or State of Maryland, and its inhabitants as such, but embrace within their scope a use of the Government of the United States.

3rd. The expropriation of land in Maryland for the purpose of supplying the city of Washington with water, is, in every sense, a taking of it *for public use*, and, therefore, the Act of 1853, ch. 179, authorizing such expropriation, is not unconstitutional.

4th. The Government of the United States has power, under the last two clauses of the Constitution of the United States, to construct an aqueduct, drawing its supply of water for the city of Washington, from within the limits of Maryland, and using and occupying land for that purpose in Maryland, by permission and consent of the State.

APPEAL from the equity side of the Circuit Court for Montgomery county.

This appeal is from an order refusing an injunction, upon a bill filed by the appellant against the appellees in April 1858.

The bill alleges that the complainant is and has been for a long time, and was, long before the commission of the trespasses hereinafter described, seized and possessed of a valuable tract of land called "The Resurvey of Magruder's and Bell's Honesty," situated in Montgomery county, containing one hundred and thirty acres, more or less; that certain individuals, (the defendants,) contriving and confederating together, on the 1st of April 1857, and on divers days and times between that day and the day of the filing of this bill, with force and arms, broke and entered complainant's said close or tract of land, tore down his fences, cut down and destroyed his crops, dug up and subverted his soil, and other great and irreparable damage to him then and there did, to his great injury; that

said defendants have resolved and declared to complainant, and openly to others, that it is their fixed determination to continue said trespasses, and to do in and upon said land, and to complainant, like and further and greater irreparable damage; having dug deep holes in the earth and soil of the complainant, they are steadily and recklessly proceeding to plant and build thereon a large and heavy stone pillar or abutment, of about forty feet at the base, to be planted above one hundred feet beneath the soil, the said pillar being, as they allege, intended for the support of a bridge or aqueduct across a stream of water called "The Cabin John Branch," adjacent to complainant's said land, and they aver and declare that it is their fixed resolution and determination to continue the erection of said stone pillar or abutment until it shall be finished, or until the said bridge or aqueduct shall be completed and permanently established, which will be doing irreparable damage to complainant, inasmuch as it will be impossible for him except at incalculable and ruinous expense, to remove, fill up and restore the same, and that said bridge and pillar will be wholly useless to him, and if it were not, it is the fixed and avowed determination of the defendants so to construct said bridge or aqueduct, that it shall never be used by him or the public at large.

The bill further charges that the defendants have, in addition to their other trespasses, driven down into complainant's land two lines of stakes, beginning at the proposed termination of said bridge on his land and extending entirely across or through a part of his land, and have marked out a space between said lines of two hundred feet in width through the whole of said extent, for the purpose, as they allege, of digging up, carrying away and converting to their own use, the inexhaustible banks of clay there to be found, which clay is of a character peculiarly valuable to complainant, being of that sort known as aluminous clay, and worth to him a large sum of money, all which they declare they mean to use in the construction of said aqueduct, or for purposes connected therewith, both on and off his land. In procuring said clay and in constructing said aqueduct, they aver their intention of digging up

complainant's soil to a great depth, and, for the purpose of forming an aqueduct through his land, will necessarily be compelled to go to the depth of twelve or fifteen feet in many places, and in others, where the land is lower, will be compelled to raise great banks upon his land, and also to erect brick walls through the same, and to cause a large and perpetual stream of water to flow through it for the sole use and benefit of said aqueduct, and to his entire exclusion, all which they declare it is their intention to do.    This the complainant alleges will be doing irreparable damage to him, by permanently dividing his land, not only to depriving him of said valuable clay, and of the use of the land over and through which the said deep holes shall be dug, and the said ditches shall be cut, and the said aqueduct shall be built, but totally and forever obstructing him in his necessary use of his land for tillage, and his passage and progress for farming and other purposes, from one part to the other of that portion of his land so intended to be divided, dug up, built upon and obstructed.

The bill further states that complainant has instituted his action of trespass *quare clausum fregit* in the Circuit Court of Montgomery county, for the purpose of recovering damages against the defendants for the said trespasses, in the trial of which cause his rights will be adjudged by said court, and justice done him, so far as relates to said past trespasses, but not to any trespass which may be subsequently committed, or the exercise of any preventive justice by which they may be restrained from doing irreparable damage to him.

It further states that said defendants pretend that in all trespasses which, as above charged, they have committed, and for all they threaten and meditate doing, as now set forth, they are authorized and protected by the authority of the Executive of the United States, such action of the Executive not being sanctioned by any Act of Congress, as complainant avers, under which any taking of private property for actual or pretended public use could be justified, but the only purpose of such action being the supply of water to the city of Washington, or the cities of Washington and Georgetown, beyond the territory of the State of Maryland, for which supply Congress

has made merely, from time to time, appropriations, without any legislative enactment prescribing the taking of property, or any other proceedings or means for effecting such supply. The complainant further states that said persons so transgressing, claim colour of authority for that action of the Executive of the United States, under the Act of the Legislature of Maryland of 1853, ch. 179, which purports (invalidly and ineffectually, as complainant insists) to give authority to the United States to purchase land for so supplying water through construction of dams, reservoirs, buildings and other works, and over such land to exercise necessary jurisdiction concurrently with the State of Maryland, and authorizing, in case of owners of lands and materials not agreeing with the United States for a sale, adverse appropriation of such lands and of requisite materials from lands in Maryland, by condemnation, and in valuation in manner as prescribed in the case of the Chesapeake and Ohio Canal Company's occasions for land and materials for that company's works, and he avers that no Act of Congress allowing any purchase by or for the United States, was ever passed, nor was any attempt by or for the United States ever made towards an agreement with him for a purchase of his land with reference to said works, and he insists and charges that all pretended authorization and sanction aforesaid, under said action of the Executive of the United States, and under such Act of the Legislature of Maryland, is repugnant to the Constitution of the United States and the Constitution of Maryland, and apart from any constitutional interest, and without regard to any organic law or principle of written law, is invalid, and cannot operate or deprive him of his property to transfer it to a municipal corporation or corporations beyond the limits of a State within whose jurisdiction and protection it lies, and for no public purpose of the State of Maryland, nor for a purpose connected with the United States, as such, and of a federal and general character, nor even so declared to be in said Act of Assembly, or in any action of Congress.

The bill then prays for an injunction restraining the defendants from cutting down any further timber on said land of

Reddall *vs.* Bryan, *et al.*

the complainant, or further proceeding in the planting or erecting any stone pillar or abutment thereon or therein, or any further digging in or through the same, or building brick or stone work thereon or therethrough, or the introduction of water through the same, or any further trespass thereon.

On this bill the court (BREWER, J.) passed an order refusing the injunction, from which the complainant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and BARTOL, J.

*John S. Tyson* for the appellant:

The first question is as to the sort of damage done and contemplated, to stay which the writ of injunction was sought. Was it *irreparable?* There cannot be a doubt on this subject. No one can hesitate to pronounce as irreparable such damage as is set forth in this bill—the digging of deep holes in the earth and planting therein stone pillars one hundred feet high, by forty feet in diameter; the digging and carrying away large banks of valuable clay; the construction of an aqueduct through the complainant's land from twelve to fifteen feet deep in some places, while in others it was raised on high banks, and permanently dividing the land by an insuperable barrier. But if it were not a case of irreparable injury, still it would remain a case of usurpation on the part of the defendants, and thus present sufficient ground for the summary interference of a court of chancery.

Has this irreparable damage to our property been rightfully or wrongfully committed? Is this alleged usurpation of property, indeed, no usurpation, but only rightful occupancy on the part of the defendants?

We have proceeded against the defendants as if they were private individuals, because acting as individuals merely, without authority, or acting under a false authority, they are personally responsible. They assume, or rather we assume for them, that they acted as the agents of the United States. Whether lawfully or unlawfully, is the question.

They pretend to derive their authority from sundry Acts of

57    v. 14

Reddall vs. Bryan, et al.

Congress authorizing the construction of an aqueduct for the purpose of supplying the city of Washington, or the cities of Washington and Georgetown, with water, also from the Act of the General Assembly of Maryland of 1853, ch. 179.

The initiatory Act of Congress on this subject was passed in 1852, 1st Sess., 32nd Cong., ch. 108, and is a mere appropriation to enable the President to cause surveys to be made for determining the best means of affording a supply of water to the cities of Georgetown and Washington.

By an Act passed at the second session of the same Congress, ch. 97, being the general appropriation Act of that session, $100,000 are set apart to be expended under the direction of the President for the purpose of bringing water into the city of Washington, and mention is made of the city of Georgetown. This appropriation is accompanied by the proviso, "That if any plan adopted by the President, should require water to be drawn from any source within the limits of the State of Maryland, the assent of the Legislature of that State should first be obtained."

This appropriation and proviso was not a separate and entire Act, inaugurating a separate and entire subject, concentrating upon it, alone, the whole force and authority of the legislative power, but a mere item in a general law—an appropriation Act, embracing a vast number of other items and appropriations.

The first preliminary to any assent on the part of Maryland, was to be the adoption by the President of a plan requiring water to be brought from some source within the limits of that State. Other preliminaries had been rendered necessary by a resolution of Congress, passed Sept. 11th, 1841, (5 Stat. at Large, 468,) which requires that the land or location to be purchased in another State, should first be selected, the title approved by the Attorney General of the United States, and the assent to its purchase requested of that State by the Secretary of War, before any such assent could be given or received. The Legislature of Maryland kindly dispensed with all these preliminaries, by the voluntary passage of the Act of 1853, ch. 179.

This Act was not passed after the adoption of a plan by the President requiring water to be drawn from Maryland sources, but made to take effect upon the contingency of such adoption, and it renders unnecessary any compliance on the part of the Attorney General and the Secretary of War, with the resolution of 1841, by an anticipatory grant. So eager was this little State to surrender to "The Monster Republic" her precious right of eminent domain, that, in the uncertainty whether any or which Maryland fountain or fresh stream would be selected, she offers, by one fell swoop, to sacrifice them all to the President of the United States—peaceably, if it can be accomplished by the peaceable surrender of the citizen; if not, then by the intervention of all the powers of the State and of the United States.

This statement of the case should lead us to the conclusion that the Act of 1853 is repugnant to any organic law which a free State could be supposed to form, and, accordingly, we do find and pronounce that it is repugnant:

1st. To the Constitution and laws of Maryland.

2nd. To the Constitution and Laws of the United States.

It is repugnant to that clause of the Constitution of Maryland (Art. 3, sec. 46) which declares that "the Legislature shall enact no law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

This Article does not expressly authorize private property to be taken for the public use; it tacitly recognizes the right as inherent in the government, (as, indeed, it is in every civilized government,) and merely guards its exercise. But neither the recognition nor the guard were incorporated into the old Constitution, both being regarded as equally inherent in the political organization of the State—*lex non scripta*—the inherent right of eminent domain. This right is ever accompanied with qualifications equally inherent and binding on the Government—

1st. Not to take private property, unless for public use.

2nd. Not so to take it without just compensation.

The right of the Government to take property, thus qualified, is derived (or presumed so to be) from original compact, and is only *acknowledged* by Art. 3, sec. 46, of the Maryland Constitution. Let us, then, ascertain the meaning of the words, "public use." 1st. Who are the public? 2nd. What is the nature of the use? 3rd. Who is to judge of the nature of the use?

To be able to answer the first question, it is only necessary to know who are the parties to the aforesaid compact. They are each individual and the whole State. The public here meant, are the public of Maryland—no other public being parties to the compact. Public use, therefore, means the use of the people of Maryland.

In 5 *Md. Rep.*, 320, *Moale vs. The Mayor & C. C. of Balto.*, Chief Justice Le Grand, in drawing the distinction between the taxing power and the right of eminent domain, adopts the able opinion of Justice Ruggles in the case of the *People vs. The Mayor, &c., of Brooklyn*, 4 *Comstock*, 423, 425: "Taxation exacts money or services from individuals, as and for their respective shares of contribution to any public burthen. Private property taken for public use by right of *eminent domain*, is taken, not as the owner's share of contribution to a general burthen, but as so much beyond his share. Special compensation is, therefore, to be made in the latter case, because the Government is a debtor for the property so taken; but not in the former case," &c. "So much beyond his share;" who are the other contributors? The rest of the people of Maryland. Among whom is the surplus share to be divided? Among the rest of the people of Maryland. And the compensation to the individual owner, for his surplus share, who pays that? The rest of the people of Maryland. The public is the public of Maryland. The shareholders are the people of Maryland. The parties benefitted are the people of Maryland. The contributors to the compensation are the people of Maryland. Not any other people; not the people of any other State; not the people of the United States; not the people of Washington City.

Surely the word, "public," in Art. 3, sec. 46, of the Con-

Reddall *vs.* Bryan, *et al.*

stitution of Maryland, could not refer to any public other than the public—the people of Maryland; not to the people of any foreign State, or of any one of the States of this Union; nor to the people of the United States, all of whom are foreign States in reference to Maryland. The Convention of 1850 represented the people of Maryland, and could create a compact for no other people. Where a great public measure, such as the Act incorporating the Chesapeake and Ohio Canal Company, is enacted by the Legislature of Maryland, subject to the adoption of other States, such Act receives no vitality until such general adoption, because each State acts under its own sovereignty, and can confer no benefit, nor impose any obligation on any other sovereignty.

Mr. Attorney General Cushing, in his argument on this subject, insists that the public use of the United States is a public use of each part of the United States, and, therefore, of each one of the States—that is, that the public of the United States are the public of Maryland, and the public use of the United States is the public use of Maryland. It is just as reasonable to say, that the public use of Maryland is the public use of the United States, which, legally and constitutionally, it certainly is not. Each State of the Union, and the whole United States, as a body in reference to each other, are as distinct and separate in their several political capacities, as either one is from a foreign European State. The people of Maryland are people of the United States, but does it follow that the people of the United States are the people of Maryland? The planet Jupiter is a part of this solar system; her inhabitants are inhabitants of the solar system, but does it follow that all the inhabitants of the solar system are inhabitants of Jupiter? The idea is absurd.

The Constitution of Maryland, therefore, when it speaks of her Legislature and the public, means her own Legislature and the public of the State.

2nd. The use must be public—that is, for the people of Maryland. Another ingenious thought of the Attorney General here presents itself: "The Art. 3rd, sec. 46, of the Maryland Constitution, is of command only as to the matter of

compensation. It assumes the power of the State to expro-priate in the right of eminent domain, and looks by way of enactment to the single fact of guarding the citizens against loss, by reason of the expropriation." *Opinion of Attorney Generals, Vol. 7, page* 120. She may expropriate as she pleases, and what she pleases; she may seize and sell at her discretion; she may take your paternal acres, although your most darling desire is, that these shall descend to your chil-dren, provided, she will only pay for a legal, that is, an arbi-trary, compensation. *We know* that this is not the law of Ma-ryland. It is true that our Constitution assumes the right of eminent domain, with its consequent powers, but as a right only to be exercised for the good of the whole State, not arbi-trary, but well defined, precisely as it is in the said third Ar-ticle.

The *very same* provision is in the Constitution of the United States, (5th Amendment.) Would Mr. Cushing put the same construction upon it? Will he say, that the only limit under that amendment to the right of expropriation is the obligation to compensate? And that, with this limitation alone, Con-gress may expropriate, at its pleasure, over the Union? No doctrine could be devised which would so completely place the States of this Union under the absolute control of the Fed-eral Government. It would prove a "north-west passage" to consolidation, and finally to absolute power. The language, both of the Constitution of the United States and of the State of Maryland, is expressly at variance with any such interpre-tation. "Private property shall not be taken for public use," (which means, except for public use,) "and without just com-pensation."

Further, Mr. Cushing thinks that, "because the aqueduct is intended to benefit the city of Washington, it will in part be for the use of Maryland, because Washington is the seat of the Federal Government of the United States, and is, *pro tanto,* a seat of government for the State of Maryland, at which she appears, not only by the Executive in whose election she par-ticipates, and her members of the House of Representatives, but more emphatically by Senators, who constitute the very

Reddall *vs.* Bryan, *et al.*

ministers of her state sovereignty in the Congress of the United States."

In the first place, Mr. Cushing is mistaken in assuming that the city of Washington is the seat of government of the United States. The 1st Art., 8th sec., No. 18, of the Constitution, gives "exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of government of the United States," &c. This ten miles square was ceded and accepted, and accordingly became the *seat of government*—the Capital of the United States. This ten miles square has also the character of a territory. Indeed, we have high authority for saying that because it has a distinct political society, it is a State, according to the definitions of writers on general law, although not a State of this confederacy in the sense used in the Constitution. 2 *Cranch.*, 445, *Hepburn et al., vs. Ellzey.—Ch. J. Marshall.* Being, therefore, in a general sense, a State, and in every sense a territory, it may have its capital. It has its capital, and that capital is the city of Washington. The whole territory of Columbia is the capital of the United States, made so by the Constitution; Washington is but the local capital of the territory. Washington is no more the capital of the United States than is the city of Georgetown, which is also in the District of Columbia; yet no one will contend that expropriation for the use of Georgetown would be expropriation for the use of Maryland. Even if Washington were the capital of the United States, the Act of 1853 would be void, because the power to enact it is not granted by the Constitution of Maryland, nor *understood* in her original compact.

Further arguing, Mr. Cushing says, "Even if the land thus acquired, could be considered as an addition to the District, still it would constitute no objection, because, in declaring that Congress may exercise exclusive jurisdiction in a district, not exceeding ten miles square, ceded to become the seat of government, the Constitution does not mean to prescribe the geometrical form, but only the superficial contents of such district, which, as at present constituted, is of a rhomboidal form, and much less than ten miles square in actual dimensions."

Reddall *vs.* Bryan, *et al.*

The answer to this is, that this is one of those cases in which matter of form is matter of substance. This territory was to be the greatest capital of the greatest nation of the world, and required the most appropriate figure for the development of its beauty, glory and perfection. This was seen by the eye of Washington, as from the heights of the present capital, or those above Georgetown, he beheld the beautiful region watered by the Potomac. He saw that a square only, and not a triangle, or rhomboid, or paralellogram, or trapezium, was the proper figure, and ten miles square the proper space, for the development of the capital, and it was fixed in the Constitution that such should be its form and dimensions. Congress has the power to cede away a part of this territory, which it has done. But it has no power to add to it, without adding also to the Constitution.

But acceptance was necessary to the validity of the original grant of a seat of government, and it followed the grant. Acceptance is equally necessary to such a grant as that contained in the Act of 1853, and there has been none. It is for this reason, if for no other, void.

But I have yet to learn under what clause of the *Constitution of the United States,* Congress has power to purchase lands or water power in another State, for the construction of an *aqueduct* for the use of the city of Washington. It is pretended that the 1st Art., 8th sec., No. 18, of the Constitution confers it in the following words: "Congress shall exercise exclusive legislation over all places, purchased by consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings." There is no mention of aqueducts, nor is there any thing in the clause from which the right to build aqueducts could be inferred, unless it be contained in the words, "needful buildings." But these words clearly have reference to forts, magazines, arsenals and dock-yards, and mean needful buildings incidental to them. They are the principals, the needful buildings the accessories.

But there is one thing always required in these cases, and that is, purchase. The government must purchase the pro-

perty which it means to acquire, and then call upon the State to sanction such purchase. His honor, Judge Brewer, affixes the idea of purchase to a forced inquisition and assessment of damages, such as that prescribed in the Act of 1853. But this is not the idea of purchase, sanctioned by law, nor is it that which is meant in the Constitution of the United States. *Blackstone, Book* II, *Ch.* 15, enumerates various sorts of "purchase," and among them, speaks of that "vulgar acceptation, which is applied only to such acquisitions of land as are obtained by way of bargain and sale for money, or some other valuable consideration." That is the common sense understanding of the term. This vulgar acceptation, this common sense understanding of the term, is precisely what was meant by the word "purchase," in the Constitution of the United States. Why? Because the Constitution was intended for all the people of the United States, and, therefore, would only use words of universal application, such as is the word "purchase," in its vulgar and common sense interpretation. The laws of the United States invariably use it in that sense. 5 *Stat. at Large, page* 468. So do the laws of Maryland. See the case of the Naval Academy Act of 1847, ch. 158, and the various laws on the subject of the Cumberland Turnpike Road.

Now, this bill positively avers that no attempt was ever made by or for the United States, to form an agreement with the complainant for the purchase of his land with reference to said aqueduct. The appropriation, therefore, of the land of the complainant for the use of the aqueduct, was in direct violation of the Constitution of the United States. And if such contract had been made by any member of the government with the appellant, the same not having been authorized by any law of Congress, as required by the Act of 1820, ch. 52, it would, under that Act, have been wholly inoperative and void. It would have been equally void under the resolution of Congress, Sept. 11th, 1841, *(Stat. at Large, Vol. 5th,)* which requires the assent to such purchase of the State of Maryland, to be asked and given.

The appellant, therefore, is thrown for protection upon the

21st Article of the Bill of Rights of Maryland: "That no freeman ought to be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land." The disjunctive conjunction, "or," in this Article, must be taken to mean "and," because a case may be supposed in which a freeman may be deprived by a judgment of his peers, in violation of the law of the land. The appellant, however, has been deprived of his property without judgment of his peers, and in violation of the law of the land.

The appellant is thrown, also, for protection upon the 10th sec. of the first Article of the Constitution of the United States, which forbids any State to pass any law impairing the sacred obligation of contracts. It is universally conceded that by the term contract, is here included conveyances and grants of land, and public compacts. The deed, therefore, conveying to the appellant his land, and the compact between him and the State of Maryland, by which the latter was solemnly bound not to take his property except for public use, were such contracts, and have been grossly violated by the Act of 1853, ch. 179.

3rd. The last question to be considered is, who are to judge of the nature of this use, and to define the relative obligations of the citizen and the State? The answer is obvious: The judiciary. This question is, here and now, before the proper tribunal. In the wildness and recklessness of legislative action, laws may be passed repugnant to other laws, repugnant to the organic law of the State, subversive of the rights of the citizen, and subversive of the peace and order of the government. This may be done, and has been done. The only remedy and corrective is to be found in an enlightened judiciary. In such a case, and to such a judiciary, I now appeal, with the utmost confidence in the integrity and intelligence of their decision.

*John Brewer* for the appellees.

A reference to the various laws of Congress, and the law of

Maryland of 1853, ch. 179, in relation to the Washington Aque-
duct, will show that Congress has appropriated $2,400,000
for the completion of this work; that these appropriations
have been made as the work progressed, from 1852 to June
1858; that these laws do not contemplate the supply of George-
town with water, and that for the supply of that city there are
other special means to be appropriated; that the work must be
nearly completed, the last appropriation being for its *comple-
tion;* that the Government of the United States is the grantee
under the law of Maryland of 1853, ch. 179, and that this
power was conferred within two months after the Act of Con-
gress of 1852, ch. 97, approved the 3d of March 1853, and
that the Government of the United States, afterwards in four
several Acts of Congress, recognize this law of Maryland, and
under it proceeded with the necessary legislation to complete
the work.

1st. As to the point in relation to the failure of the com-
plainant to set out such a case of irreparable damage as will
enable the court to grant him an injunction, it is not proposed
to comment upon the cases (as this court have so recently in
*Shipley vs. Ritter,* 7 *Md. Rep.* 408, examined the subject as
between individuals and as to private rights,) but merely to
show that in such cases no injunction will be granted where
the remedy at law exists as between individuals still holding
and owning the lands. But in this case, and such like, the
irreparable character of the damage done to the complainant
is essentially different. He has no property remaining in the
land condemned for the public use, taken by the State by vir-
tue of its right of *eminent domain.* The Act of 1853, ch.
179, was passed for the very purpose of taking away from the
citizen his lands, if *resuming* the paramount right of the
State, of causing a *divestiture* of the owner's right. The dam-
age must be *irreparable* in a different sense, therefore, when
the State resumes the property and the citizen's interest in it
is taken away. The irreparable character of such damage in
the cases of condemnation of land, arises when no provision is
made for the payment of the condemnation money assessed as
damage and value of the land thus taken by the State from

the citizen.   His damage is irreparable, if his lands be taken without compensation, and that is the only way in which it is irreparable.   The State might, by virtue of this right, condemn his whole farm, make a *reservoir* of it, or apply it to any other public use, and if he was paid or tendered its value, the damage could not be considered as irreparable.   Now, in this case, though it is hinted at and implied, and rather obscurely set forth, that this land of the complainant has been condemned and taken for the public use, under the Act of 1853, authorizing it to be so taken for the Washington Aqueduct, yet the complainant does not state that his land was or was not condemned.   He does not state whether or not there was damage allowed him for this taking of his land, what it was, or whether or not it was paid or tendered.   He makes no such statement, therefore, as shows that the damage done by taking his land would not be amply paid for, by the money awarded to him by the court and jury, as authorized by this Act of 1853.   Hence he does not show, as he was bound to do, that there is any irreparable damage done to him.   It was necessary, in order to enable him to obtain an injunction, to state the condemnation and the refusal to pay or tender, and that no provision had been made for the compensation.   He has failed to place before the court all the facts of the case.   There is also another defect in the bill, in stating the alleged damage and the want of proper redress.   He alleges that he has instituted an action of trespass, in the trial of which, his rights will be adjudged and justice done him, so far as relates to the past trespass, but not as to future trespasses.   Now, as the injury done, according to his description of it, is an utter destruction of his property, he must be allowed its *entire value* in the trespass suit, and if he be allowed its entire value, there is no scope or ground for any other damage, or any other recovery, and thus his action of trespass, by his own showing, is fully sufficient to enable him to recover for all the damages done to his land, and none of them are irreparable.

2nd.   The Act of 1853, authorizes lands in Maryland to be condemned for the purpose of supplying the city of Washing-

Reddall *vs.* Bryan, *et al.*

ton with water, and that the same proceedings shall be had as in the law (Act of 1824, ch. 79, secs. 15, 19, &c.) conferring that authority on the Ches. & Ohio Canal Co. As already stated, there is nothing in the bill to show that the condemnation of this land has not, in all things, been legally executed and the title vested in the United States. He alleges that no attempt was ever made by or for the United States towards an agreement with him for the purchase of his lands, with reference *to the said works*, and this is relied on to show the failure of the United States to comply with the law. To this we reply: 1st. That in the connection in which the words *are used* in the bill, the *works* referred to are those of the Chesapeake and Ohio Canal, which renders the averment irrelevant and immaterial. 2nd. Both the Acts of 1853 and 1824, make a discrimination in the mode of proceeding, between resident and non-resident owners of land to be condemned. If the owner be a *non-resident*, or be out of the State or county, no effort need be made to *purchase* the land of him before proceedings of condemnation. Now, the complainant does not *claim to be* a resident of this State. He has not stated his residence. He cannot, therefore, avail himself of the privilege given to residents which seems to imply that such proceedings to condemn must be when the United States cannot agree with the owners, who are residents. In this, therefore, he has failed to allege that the law has not been complied with by the United States. 3rd. The Act of 1824, in its 19th sec., declares that it shall be lawful, where the consent of the owner cannot be obtained, to enter upon his land and proceed with the work, and that the pendency of any proceedings in any suit in the nature of *ad quod damnum*, and any other proceedings, shall not hinder or delay the work. Hence, it was obviously intended that these great public works should not be arrested by the obstinacy or extortion of individuals, and that no injunction should be granted for such a purpose, even pending the condemnation. 4th. These proceedings to condemn, and this valuation or assessment, by sec. 15 of the Act of 1824, are declared to be conclusive upon all parties. 5th. There is no averment in the bill that the United States

have not offered to buy the six acres required; the averment in this respect being only that there was no effort to purchase his " *aforesaid land,*" which means his *whole land* or farm of one hundred and thirty acres, and the averment, therefore, does not necessarily exclude the conclusion that the United States may have offered to purchase the *part* of this land required.

There is another objection to the averments of the bill as alleging no sufficient cause for an injunction. It alleges that these trespasses were committed from the 1st of April 1857, till the day of filing the bill, some time in April 1858. For more than twelve months, therefore, after these works were being erected, were these trespasses continued without objection on the part of the complainant. Before that time Congress had passed various laws for the purpose of constructing this aqueduct. In 1853, the Maryland law on the subject was passed. Congress had before these alleged trespasses began, appropriated $1,600,000 for the construction of this work, as it was being expended from 1852 to 1857. Now this complainant being presumed to know all these laws, must have known too, that these vast works, these excavations and embankments, and abutments, built at the expense of thousands of dollars, and stone and other materials brought on his land at the expense of tens of thousands more, were for this costly aqueduct. Yet, knowing all this, he makes no objection for twelve months, and after having thus induced the United States to expend on his land more than a hundred times it value, he then comes forward and files this bill for an injunction to arrest this great work in its progress. This lying by and permitting large sums of money to be expended without objection deprive the complainant of all equity. *Saxton's Rep.,* 518, *Southard vs. Morris Canal.* 3 *Edw. Ch. Rep.,* 552, *Water Commissioners vs. Lawrence.* 9 *G. & J.* 468, *Amelung vs. Seekamp.* 2 *Bland,* 99, *Binney's Case.* In the case of an individual who remains silent while another assumes a right to build on, and does build on his land, his neglect to object concludes him forever. The injunction must be recommended by the dictates of conscience

Reddall *vs.* Bryan, *et al.*

and sanctioned by the clearest principles of justice, and it is then a question for the discretion of the court. 8 *G. & J.*, 93 *Md.*, *Savings Inst. vs. Schroeder.* 9 *G. & J.*, 479, *Tide Water Canal Co. vs. Archer.* 10 *Md. Rep.*, 89, *Roman vs. Strauss.* 12 *Md. Rep.*, 315, *Nusbaum vs. Stein et al.* When such a high and extraordinary power is called for, as the granting of an injunction attended with such consequences as the granting of this would be, I must see *clearly* and *distinctly*, says Judge Archer, in *Wilson vs. Mayor & C. C. of Baltimore*, 5 *Gill*, 391, that a positive injury has been inflicted. See, also, 23 *Conn.*, 421, *Whittlesey vs. Rail Road Co.* 2 *Green's Ch. Rep.*, 467, *Capner vs. Flemington Co. Ibid.*, 482, *Perkins vs. Collins.* 11 *Md. Rep.*, 1, *Cherry vs. Stein.* The court will the longer hesitate to reverse the order of the judge in this case from the fact that the records of condemnation of these lands, if they existed, (and from the statements of the bill and his opinion, we have the right to assume that they do exist,) would be in the court where he presided when this bill was presented for his action, and from them he would have knowledge, judicially, of these condemnations, and of the proceedings of the United States in the construction of this work, which knowledge this court cannot have, because the bill has failed to disclose whether or not any condemnation has taken place.

3rd. The Act of 1853, is not in conflict with the 46th sec. of the 3rd Art. of the Constitution of Maryland. It *does* in its very language require the condemnation of the land, and payment or tender of the value according to the mode pointed out by the Act of 1824, which has often, in the many cases in which the Chesapeake and Ohio Canal Company was a party, been decided to be constitutional. Millions of property have been expended by the State and individuals upon the *concession*, that this law of 1824 is constitutional. 4 *G. & J.*, 1. Is this Washington Aqueduct a public use? The Legislature are the exclusive judges of this matter. 9 *Barb.*, 350, *Harris vs. Thompson.* 19 *Barb.*, 166, *Hartwell vs. Armstrong.* It is public though confined to a particular district. The benefit need not be universal, nor even general, and some may be

Reddall *vs.* Bryan, *et al.*

benefitted more than others. The court will presume the Legislature acted on good and sufficient evidence, and that presumption is conclusive. 19 *Barb.*, 81, *De Camp vs. Eveland.* 5 *Paige*, 137, *Varick vs. Smith.* It is sufficient if the public *convenience*, or *utility*, or *welfare*, requires it. 5 *Gill*, 383, *Alexander et al. vs. Mayor & C. C. of Balto.* 5 *Md. Rep.*, 320, *Moale vs. Mayor & C. C. of Balto.* 7 *Md. Rep.*, 500, *Steuart vs. Mayor & C. C. of Balto.* 3 *Bland*, 451, *Belona Company's Case.* Where the only question is the constitutionality of the law, equity will not interfere, but leave the party to his remedy at law. 4 *Halst. Ch. Rep.*, 237, *Troth vs. Troth.* But the aqueduct is a public use. The supply of water is for the city of Washington, the capital of the government of the United States, where, as this court will judicially notice, all the offices of the government, executive, legislative and judicial, perform various of their most important duties and many of them reside. It is the capital of that government of which this State is a component part; it is the capital of the United States of which Maryland is one. It is in one sense, therefore, the capital of this State for the transaction of all the business of this State which is required to be done by the general government under the Constitution and laws of the United States and which are the supreme law of this State. Maryland has a much more direct interest, as a State of this Union, and does thereby confer more generally, a public use, in conferring on the United States this power than she has in conferring the power to condemn land on the Chesapeake and Ohio Canal Company, for the purpose of its corporation. The health of this city, the preservation of the public buildings erected in part by the money of the people of Maryland, and which have often been consumed by fire, with valuable public records, for want of this very ample supply of water, the growth of this city, and numerous other paramount public considerations require, that Washington should be supplied with water by such an Aqueduct through part of this State. The eloquent remarks of Judge Woodbury in the case of *West River Bridge Co. vs. Dix*, 6 *How.*, 545, 547, apply strongly to the effort here made to arrest this great public work.

He says: " So as to a road, if really demanded in particular forms, &c., to accommodate a growing and changing community, and to keep up the wants and improvements of the age, such as its pressing demands for easier social intercourse, &c., and it is manifest unless such a course can be pursued, social and commercial intercourse might be petrified, and remain for ages, like the fossil remains in sand-stone, unaltered, and the government, the organ of a progressive community, be paralyzed in every important public improvement." The Legislatures of the United States and of Maryland, having both decided that the public interest requires the use of this water by such an aqueduct, in the various laws referred to this court, will consider that point as conclusively established. 5 *Paige*, 137, *Varick vs. Smith.* 9 *Barb.*, 350, *Harris vs. Thompson.* 27 *Ala.*, 104, *Burden vs. Stein.* 4 *Cushing*, 60, *Lumbard vs. Stearns.* Who can judge of the wants of the city of Washington and of the propriety of relieving them better than these legislatures? If it be not clear that the use is private the injunction will not be granted. 1 *Bald.*, 205, *Bonaparte vs. Rail Road Co.* So far from this being the case, is it not clear that the use is for the public, not for a corporation, whose object (though that may be public) would be for the profit of its individual stockholders, but for the General Government, its officers, buildings? &c. Assuming, as we have the right to do, from the failure of the complainant to aver the contrary in his bill, and from the implications that it is so in various parts of his bill, that his land has been condemned, he is now concluded by that condemnation, no other court having jurisdiction over the matter, the special means of redress being under that law and that law only. *Act of* 1824, *Ch.* 79, *secs.* 15, 19. 4 *Johns. Ch. Rep.*, 352, *Le Roy vs. Corporation of New York.* 5 *Gill*, 398, *Alexander, et al. vs. Mayor and C. C. of Balto.* 8 *G. & J.*, 443, *Wil., & Susq. Rail Road Co. vs. Condon.* 11 *G. & J.*, 398, *Ches. & Ohio Canal Co. vs. Grove.* 1 *Md. Rep.*, 567, *Hamilton vs. Annapolis & Elk Ridge Rail Road Co.* 7 *Md. Rep.*, 500, *Stewart vs. Mayor & C. C. of Balto.* 10 *Md. Rep.*, 544, *Graff vs. Mayor & C. C. of Balto.* " The unconsti-

tutionality of a law must be clear, decided, inevitable. The court cannot inquire into the wisdom, policy or justice of the Legislature." 1 *Bald.,* 76, 441, 442. " To render a law unconstitutional, the repugnance must be clear, immediate and direct, not merely speculative, indirect and contingent." 3 *Gill,* 14, *Howell vs. The State.* "We are bound to presume, in the absence of evidence, that the tax was laid according to the Constitution," say the court in 1 *Gill,* 308, *Waters vs. The State.* Nor is this Act of 1853, unconstitutional in view of sec. 17, Art. 3, of the Constitution of Maryland. That point is so fully disposed of in the opinion of Judge Brewer in the case of *Anderson vs. The United States,* and by this court in *Davis vs. The State,* 7 *Md. Rep.,* 159, that nothing more need be said on that subject.

4th. As to the constitutionality of the Act of 1853, and the proceedings thereunder, in respect to that part of sec. 8, Art. 1, of the Constitution of the United States, which declares that Congress shall have power to exercise *exclusive* legislation in all cases whatever, over such district not exceeding ten miles square, as may by the cession of particular States, and the acceptance of Congress, become the seat of Government, and to exercise like authority over all places *purchased* by the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings. For the meaning of the word, *purchased,* in this clause, we refer to the opinion of Judge Brewer in *Anderson vs. The United States,* and the authorities cited by him. If this general extended meaning of the word *purchase* be not adopted, the Government of the United States would not have the power to accept a *gift* or *devise* of land for a *fort* or other necessary public work. But the Act of 1853, does not authorise the United States to exercise *exclusive legislation,* or indeed any legislation at all, over the condemned land to be used for this aqueduct, but to purchase such lands and construct dams, &c., and to exercise *concurrently* with Maryland, such jurisdiction over the same as may be necessary for the purpose of constructing dams, &c. Maryland still continues its jurisdiction. If, therefore, this law does not

authorize *exclusive* legislation over the condemned land, this clause of the Constitution of the United States does not apply to it. This clause does not, nor does any other in that instrument, prohibit the exercise of the *concurrent* jurisdiction to purchase lands, build dams, &c., with the consent of the State. It was intended to limit the instances of *exclusive* legislation to be exercised by the United States. It was no objection under this clause, that the United States became a stockholder in the Chesapeake and Ohio Canal Company, and with its other corporators, exercised this very power now conferred on the United States concurrently with Maryland by the Act of 1853. The effect of such a limited construction of the powers of the national government in the acquisition of territory upon the purchases it made of Louisiana, Florida, and parts of Mexico, would lead to consequences that might destroy the Union. But it is submitted that the powers conferred by the last section of this article, " To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States or any department thereof " may be invoked to maintain the laws of the United States in relation to this subject. Now, assuming, as we have the right to do since the legislation of Congress and of Maryland has taken place, that an abundant supply of wholesome water is required at the seat of government, and cannot be obtained in the District of Columbia, and that it can be had in Maryland, cannot the United States accept this Act of 1853 and execute it ? If it cannot, then the capital of the Union may be without a supply of water, which the health of the officers of the government, their comfort and convenience, the security of the public buildings, the safety of the public records and other property, require; then the seat of Government of the United States may fail to answer the object of its establishment; then this " *exclusive legislation in all cases whatever* " over this District, does not comprehend the power of legislation to prevent the failure of the seat of government to answer the end for which it was established. This is such a suicidal construction of the powers given over

the District of Columbia as to be altogether inadmissible. *3 Story's Com. Const., secs.,* 1243 to 1250. The same rigid construction would prove that the establishment of the Military Academy in New York, the Naval Academy in Maryland, the Observatory in Washington, the laws authorising the coast survey, the erection of custom houses, post-offices, and even forts, magazines and light-houses, are unconstitutional for want of express powers in the Constitution of United States. 3 *Story's Com. Const., sec.* 1253, *note* 1.

It is also said the 5th amendment to the Constitution of the United States, that private property shall not be taken for public use without just compensation, applies to this case, and inhibits the United States from taking this land for the aqueduct. Now, this *assumes* that private property in this case was taken without just compensation, which the bill does allege as a fact, and, therefore, the fact does not appear in order to apply this clause to the case. It cannot apply to the Act of 1853, for that in its very terms requires the condemnation, &c., and moreover this clause does not apply to any limitation upon the power to be exercised by the States, but solely to a limitation on the power of the United States to take private property for public use without just compensation. 7 *Pet.,* 243, *Barron vs. Mayor & C. C. of Balto.* It seems to us, therefore, that this clause does not aid the complainant's case. But does it not aid the defence? It is in effect a declaration that private property may be taken for public use *with* just compensation, by the Government of the United States. Then if it be purchased by the consent of the Legislature of the State, and the *necessary* (not *exclusive*) jurisdiction be ceded by the State to the United States, as required by the joint resolution of Congress of Sept., 1841, the acquisition of this land by the United States is constitutional. The power granted, (sec. 8, Art. 1,) limits the cases where the General Government shall exercise *exclusive* legislation, but the clause here referred to speaks of the *necessary* legislation, not *exclusive.* In many cases, such as this very purchase of the land for an aqueduct, *exclusive* legislation is not required to be exercised by the United States, and, therefore, only *concurrent* jurisdiction is granted by the

Reddall *vs.* Bryan, *et al.*

State. So, also, in the Act of 1845, ch. 215, ceding to the United States the sites of forts Madison and Severn: " The Commonwealth shall retain a concurrent jurisdiction with the United States in and over the ceded territory." So the Acts of 1847, ch. 158, and 1853, ch. 185, as to the Naval Academy, and also the Acts of 1856, chaps. 176 and 207, where the State reserves the right of concurrent jurisdiction. Now, in all these cases, where the lands are held by the United States, for necessary public purposes, in this State, there is only *concurrent* jurisdiction granted, and, therefore, they cannot be held under the first article of the Constitution of the United States. From these cases it appears that the Government of the United States can hold property in Maryland without having *exclusive* legislation over the same, and that, therefore, this property, thus held, is not held by the United States under Art. 1, sec. 8, which is a limitation on such property as the United States shall hold, over which they are authorised to exercise *exclusive* legislation; we, therefore, conclude that the United States may hold land in this State under the Constitution of the United States, the power to hold which is not comprehended in Art. 1, sec. 8, of the Constitution, and this land purchased for the Washington Aqueduct may be so held.

In reply to the objection that the United States have not assented to this law of Maryland, we refer to the solemn assent given by Congress and the President, in the various laws making appropriations for the construction of this aqueduct. And in reply to the objection that the whole State is made subject to this law, we say that its operation must be confined to the valley of the Potomac, as the only locality which could furnish the supply of water, and that the Chesapeake and Ohio Canal being confined to that valley, so would the construction given to the sections of its charter, under which this law is to be executed, confine the operation of the Act of 1853 to that valley.

*Chas. F. Mayer* for the appellant in reply.

The appellees contend that the bill shows no case of irrep-

arable damage, and therefore no ground for an injunction.
An injury is shown that involves the appropriation of the land
itself, the substance of the inheritance, threatens the just en-
joyment of the property in future, and proves itself not merely
a trespass, fugitive and temporary, but in effect a nuisance.
In such cases all authorities unite in awarding an injunction.
7 *Md. Rep.*, 408, *Shipley vs. Ritter.* 1 *Md. Rep.*, 543,
*White vs. Flannigain.* 2 *Story's Eq.*, sec. 928. 3 *Atk.*, 21,
*Coulson vs. White.* 18 *How.*, 431, *State of Pennsylvania
vs. Wheeling Bridge.* 18 *Ves.*, 186, *Thomas vs. Oakley.*
The superlative term *"irreparable,"* is not here taken literally,
else the injured one's redress by injunction would depend on
the wrong-doer's purse, and his ability to pay an extreme sum
for damages would be his license for outrage, and a govern-
ment with a nation's wealth would, by imperial grace, be tyrant
over every man's possessions.

It is not necessary to dwell on the objection, that an action
of trespass for the intrusion here, has been brought. If it were
to operate in the way singularly fancied on the part of the ap-
pellees, and to supersede this equitable proceeding, we could
be put, and on motion, to our election of remedies. But there
is no equivalent in our suit at law for our present procedure.
Indeed, so important was an attendant suit at law, *to try title,*
at one period deemed, that in no case of injury to land, of
nuisance, &c., was an injunction applicable, unless to run
with a suit at law. In the very case (the cardinal reference
for irreparable damage doctrine) of *Amelung vs. Seekamp,*
9, *G. & J*, 468, there was an action at law to which the in-
junction was to be incidental. As was said in 1 *Ves., Sen.*,
188, *Hughes vs. Modern College,* the trespass suit would be
but for " the wrong done," and not " equal to the remedy
in equity," even if we were not to contemplate it as the
means to show title.

The appellees think that as the United States through their
agency, entered our land so resolutely and persevered in the
havoc of excavation, embankments, and construction, so un-
flinchingly, without being arrested by injunction, that remedy
to avert further evil and abate the nuisance, so boldly erected,

Reddall *vs.* Bryan, *et al.*

ought not to be granted. Because such invasion has so far prevailed, it is assumed that the appellant looked upon it approvingly or encouragingly, and so has no right to complain. It would be enough to say that the success of the violation implies no such imputed acquiescence. But it is certain that no passiveness can give title where there is an original wrong, no matter how long it be patiently borne. None of the cases cited sustain the pretension urged by the appellees. It was not allowed to prevail in *White vs. Flannigain*, 1 *Md. Rep.*, 525, nor in *Holland vs. Mayor & C. C. of Balto.*, 11 *Md. Rep.*, 186.

The appellees assume that the relief we here seek, could have been had upon appeal from the condemnation, which they take for granted (without any admission to such effect in the bill) took place in this instance. The cases cited in support of such view, only make such an appeal the fit and exclusive remedy for correcting errors, and excesses within the scope of the authority of the jury, or assessors carrying out the act of legislation. What power is there in such a procedure to have that act of legislation annulled as giving no authority at all to the jurors or assessors? No adjudication determines that proposition. The cases cited were of injuries and complaints, that admitted necessarily the operativeness of the law that took away the property in question.

These objections being removed that encumber the avenues to an inquiry into points of merit, let us look at the case upon its justice.

The right of eminent domain is conceded. Its limitations, its object and exigencies, and its safe-guards, deferring to the sanctity of individual property, are as unquestionable. The right is one of sovereignty, and the sovereignty is that under which the citizen's property is held, and that sovereignty operative in protective law, and *embodied in the public* of a State, has alone any reserved interest in the citizen's property. That reservation can, therefore, be only for the benefit of that public, as a resource and estate that the sovereign is not to be construed as having parted with. Knowing the sovereign of these auspices of our individual property, we know the *public* to whose paramount

uses and exigencies our property is tributary. The reservation of the pre-eminent right is incident to the tenure of the property, and that is under the sovereignty of the State. Our property is then answerable to this prerogative exaction only for the uses of the State of Maryland—the public of Maryland—that public territorially localized—the uses overruling our individual rights thus territorially fixed and circumscribed. When our Constitution, adopting only the terms of the general political law declares that private property shall be taken only for *public uses*, it means the *uses of the public*. *What that public is* we have defined. From the very origin and nature of the right of eminent domain the citizens' property can be taken from them only for the uses of the *public of Maryland*. For any other use than that the property of the Marylander is inviolably and sacredly his. If these views be sound the question answers itself, can a use, an object, a healthful or luxurious provision of another public than that of the Maryland public, justify the divestiture of a Maryland freehold to subserve that foreign public? The question is not whether Congress, legislating for the District, is to be deemed a local legislature or the legislature of the Union. The case of *Cohens vs. Virginia*, 6 *Wheat.*, 264, settles that point for the latter and supreme capacity. But that relation of Congress to the District of Columbia, does not make the district less a territory and a political body or State (though not a State of the Union) extraneous to Maryland, and in no sense a part of our State.

Can a supply of water for the convenience and health of the public of Washington City—an object circumscribed by the bounds of that city—be a use of the public of Maryland, to which the rights of property of Marylanders shall be subservient and succumb? It is needless to state, that, august as may be the legislative sphere of the United States, it is a government of limited powers, and that the sovereignties of the States are, within their territories, as independent as if (except for federal purposes) they were not members of the Union. They are in all but federal relations foreign as sovereigns to each other. And so as to each, except in the exer-

cise of its limited powers, is the United States. 2 *Pet.*, 586, *Buckner vs. Finley, et al.* 10 *Pet.*, 572, *Dickens vs. Beal.* 12 *Pet.*, 32, *Bank of U. S. vs. Daniel, et al.* It cannot be pretended that Congress could, acting either for the Union or for the District of Columbia, specially, by any legislation, appropriate to the United States territory of a State, whether in shape of a citizen's freehold or otherwise, although the laws of Congress, within the *enumerated subjects* of congressional action may be supreme within the borders of the Union. And so a law of Congress for the benefit of Washington City would be respected throughout the United States, but only as a law for that territory of Columbia. Except for some of the objects of federal power, the United States cannot acquire property in any State, and how it may acquire it is indicated by *Art.* 1, *sec.* 8, *part* 18, of the Constitution of the United States, and it is by *purchasing.* The *act* of purchasing is prescribed, and, therefore, there is an end of speculating, whether a technical title by purchase is declared by the Constitution as that under which the United States may enjoy property within the limits of a State. The *act* of *purchasing* never can be construed having a title divested by condemnation, or by some form other than by descent. The *purchasing* of the Constitution means buying, or, at furthest, acquiring by voluntary alienation. This view of the limited power of the United States as a proprietary of land in this shape, would, of itself, denounce the forcible appropriation by her of a Marylander's land in this instance, although under the obsequious sanction or connivance of a Maryland Act of Assembly. At least it shows that, looking at the United States as even abiding in the District of Columbia, and, with all the limited majesty of the federal agency legislating for the territory of the district, there can be no invasion by that power of the soil of Maryland and a dispossession of citizens of Maryland.

The privilege of the United States to enter upon the soil of the States, whether as purchaser or otherwise, and with reference even to objects of national concern, if not within the *enumerated* titles of power and administration, has always

60    v. 14.

been most strictly scanned. As to the right to make canals and railroads, (the internal improvement issue,) even the most liberal patrons of United States authority concede the privilege, only in the most *direct* and *urgent* connection and exigency for carrying out a *specific and express power.* 3 *Story's Com. Const.*, secs. 149, 153, ch. 26. The same jealousy of concession is shown as to the clause (*Art.* 1, *sec.* 8, *par.* 8) of the Constitution, which allows the United States to *establish* post offices and post-roads. The immunity of the soil of the States from the encroachment of the federal power is insisted on, and *establishing* is not agreed to be convertible with *making* or *building,* and the provision is inserted to give the United States only the small power of *adopting* for post routes such roads as the States may have laid out. Discussed and disputed as this interpretation has been, the sensitiveness for an exclusive freehold of the States is such, that the federal government has *practically* bowed to the restriction and acts on the interdict. There is even a judicial decision sanctioning the close construction. See *Brightly's U. S. Digest,* 4 note (*m*). The whole of this subject is treated amply by Judge Story in 3 *Com. Const.*, ch. 18, *pages* 22, 48. President Monroe's views in his message are there fully given. The idea is there scouted by him that the United States can enter a State and coercively take land.

Our opponents say that, the Maryland Legislature enacting that our land shall be taken for the accommodation of Washington city, has determined conclusively that that is within our Constitution a *public use* legitimately binding our property. The legislative function is, in other words, paramount here to the judicial department, and the conservative expounder of the citizen's constitutional rights is, by this sovereign rescript, of the General Assembly, obliterated. Let a private purpose, or an extra-territorial project be but declared to be a *public use,* and its nature changes to a matter of public concernment, and more than that, to an interest and desideratum of the public of Maryland. The statement of this bold proposition is enough to effectually repel it. None of the cases cited decide any such principle of despotism and usurpation. They only

Reddall *vs.* Bryan, *et al.*

declare that the judgment of the Legislature is decisive, that an object which does embrace the public, does so sufficiently to justify the exercise of the prerogative of eminent domain. The case referred to, of *Bonaparte vs. Rail Road Co.*, 1 *Bald.*, 205, signally illustrates this; for there the court went critically into the scrutiny as to the public nature of the object, and was nearly inclined to annul the law, because the toll of the rail road made the enterprise so egregiously a monopoly as possibly to debar the public enjoyment of the route. When the judicial ceases to be a co-equal power with the legislature, and the judiciary is silenced as a censor upon the extravagant construction, or blind encroachments of legislative authority, the proposition advanced may be welcomed, but not until then.

Our Constitution (Art. 3, sec. 46) declares that "the Legislature shall enact no law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation." This provision limits the mode of ascertaining compensation and confines it to a jury's inquiry, thus precluding the action of commissioners, which under some decisions has been declared legitimate. Even with the action of commissioners, notice to the parties interested would, as a requirement of the common law, be necessary. But it is emphatically demanded to make complete a jury trial, which, *per se*, enjoins notice to parties, and the privilege of attendance at the trial, and also implies the right of the parties to select jurors. The Act of 1824, ch. 79, made the rule of proceeding under the Act of 1853, ch. 179, allows no such privileges, elementary as they are to jury trials. No notice, no striking of jurors, no attendance at the jury's inquiry, is assured to the citizen whose land is to be taken from him. Is such a process a fulfilment of the constitutional requirement, which, save against the course of proceeding, and for the end there prescribed, makes the citizen's freehold sacredly his? We insist that this mockery of an arbitrament for the citizen's compensation—a disregard, flagrant and oppressive, of the constitutional safeguard—of itself annuls the Act of 1853, ch. 179. Although the party be a non-

resident (which we do not admit as to ourselves) the proceeding by jury and the giving of notice as to place and all other privileges are to be afforded. If these duties cannot be performed, it would only appear that a non-resident's land cannot be taken. But the fault of the Act of 1824 is, that it embraces *all proprietors*, residents and non-residents.

Without repeating what has been urged in our behalf on other points, as the failure of due acceptance of the Act of 1853, and no effort to purchase from us being shown, and other objections, we insist that they apply to bar the application of the Act as any sanction for the invasion of our estate.

BARTOL, J., delivered the opinion of this court.

In the opinion of a majority of this court, the nature of the acts complained of in this bill, and of the injury alleged, is such as to present a case of irreparable damage, which would entitle the complainant to the interposition of a court of equity by injunction, if it sufficiently appeared on the face of the bill that the acts charged were done by the defendants without authority of law.

We think there is great force in the view taken by the Circuit court of the manner in which the case of the complainant is stated in the bill, and cannot avoid the conclusion, "that it is made out by the concealment of facts having a very important bearing upon it, and which would (if fully stated) act materially upon the conscience of the court."

The right to an injunction is not *ex debito justitiæ*, but such application is addressed to the sound conscience of the chancellor, acting upon all the circumstances belonging to each particular case. He has the right to require a full and candid disclosure of all the facts, and if there appears in the proceedings, sufficient to show that this has not been made, he may properly refuse to exercise the extraordinary power of the court, through the instrumentality of a writ of injunction.

There is sufficient, however, on the face of the bill to show that the defendants are acting under the authority of the government of the United States, in the construction of an aque-

duct for supplying the city of Washington with water, and that the authority of the general government to occupy and use the lands of the complainant for that purpose, is based upon the Act of Assembly of 1853, ch. 179.

That Act authorizes the expropriation of lands within the State of Maryland, for the purpose of constructing such aqueduct. It is not alleged in the bill that the defendants have not in all things complied with the provisions of that Act, or that condemnation has not been made, as therein provided, and the damages awarded tendered to the complainant. But the ground is taken in the bill, and it has been insisted on in the argument, that the Act of 1853 is unconstitutional and void, because the use for which the property is authorized to be taken, is not "*a public use*," within the meaning of the 46th section of the 3rd Article of the Constitution.

The language of that section is:

"The Legislature shall enact no law authorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

We regard the words of this section as mandatory, both as to the *use* for which private property may be taken, and the previous payment or tender of compensation therefor. It can be taken only for *public use*. But we cannot adopt the narrow, and restricted construction of these words, contended for by the appellant's counsel. They do not mean merely a use of the government of Maryland, or of the State of Maryland, and its inhabitants as such, but, in our opinion, they embrace within their scope, a use of the government of the United States.

The supplying of the capital of the United States with water, essential for the preservation of the public buildings and public records, and alike essential for the use of the officers of the government, who are compelled to reside there, permanently or temporarily, is surely a *public use*, within the meaning of our State Constitution.

Maryland, as one of the States of the Union, and, in some

sense, an integral part of the great public, interested in and constituting a part of the general government, has, by the provision of her Constitution, which we have cited, conferred upon the Legislature the power of passing the Act of 1853, and we should have no difficulty in pronouncing that Act valid and constitutional, even if there were no other or different relations subsisting between the State of Maryland and the seat of government of the United States, than those which belong to every other State. But, as justly remarked by the judge of the Circuit court, in his opinion in the case of *United States vs. Anderson*, "By the Act of 1791, in pursuance of the 8th sec. of the 1st Article of the Constitution of the United States, the State ceded jurisdiction over its portion of the ten miles square, for certain purposes. ❊ ❊ ❊ ❊ ❊ The State never intended to abandon all interest in the District."

The relation, therefore, between the District of Columbia, composed of territory ceded by Maryland for certain purposes only, and the State of whose soil it forms a part, is more intimate and close than that which it bears to any other State.

We conclude, therefore, that the expropriation of lands in Maryland, for the purpose of supplying the city of Washington with water, may be regarded, in every sense, as *taking it for public use.*

We are also of opinion that the government of the United States possesses the power, under the Constitution, to construct such aqueduct, drawing its supply of water, if necessary, from within the limits of Maryland, and using and occupying lands for that purpose in Maryland, by the permission and consent of the State. We have not failed to recognize the force of many of the views presented in the able arguments of the appellant's counsel on this point; and we appreciate the delicacy and importance of questions, involving the exercise by the general government, of powers not expressly granted. We do not undervalue the doctrine which inculcates a jealous and watchful vigilance against any encroachment upon the rights of the States; but we know of nothing to prevent a State from entering into any contract which is not prohibited by the Constitution of the United States or its own fundamental law.

Gregg, *et al.*, *vs.* The Mayor & C. C. of Balt.

We regard the power of the Legislature to pass the Act of 1853, as clearly recognized by the 46th section of the 3rd Article of the State Constitution, and we think the power of Congress to accept the privileges granted under the Act of 1853, and to provide for the construction of the aqueduct, is conferred by the last two clauses of the eighth section of the first Article of the Constitution of the United States.

The order of the Circuit court, from which this appeal was taken, will be affirmed, and the cause remanded.

*Order affirmed with costs,*

*and cause remanded.*

(Decided July 29th, 1859.)