THOMAS BASSETT *v.* SALISBURY MANUFACTURING COMPANY AND SALISBURY MILLS.

The application to a court of equity to restrain a nuisance, is addressed to the sound discretion of the chancellor; and the power, being extraordinary in its character, will be exerted only in cases of necessity, to prevent mischiefs, for which there is no adequate remedy at law, notwithstanding the title of the plaintiff may have been already established at law,

A theoretical injury to land, or a mere diminution of its value, which may be fully compensated by damages, does not furnish ground for the interposition of courts of equity.

Therefore, when it appeared that the water from the defendants' mill-dam was thrown upon a small part of several pieces of swamp land of the plaintiff, which had never been productive or brought into use, an injunction was refused, upon the ground that the injury was not irreparable in its nature, although the plaintiff's title had been established at law.

It was *held*, also, that the acquiescence of the plaintiff and his grantors, for six years, in the defendants' maintaining such dam under a claim of right so to flow these lands, during which they made expensive erections of mills and machinery to be operated by the power so gained, furnished good reason for refusing an injunction.

Where the lands of the plaintiff were purchased, not for cultivation or other use, but to enable him to bring the defendants to terms in respect to other lands which he claimed were injured by said dam, and which claim had been many years in litigation, leaving plaintiff's title, after repeated trials, in doubt, it was *held* that the object of the purchase would be a strong, if not a decisive, objection to the exercise of this summary power; and although the court was not prepared to say that the objection would be insuperable, yet a very strong case in other respects, would be required, to overcome the repugnance of the court to lending its aid to the pressure so sought

to be applied : but in ordinary cases, at least, the plaintiff would be left to that pressure which might be made by a suit at law, even although his title had been already established.

In determining the exercise of their discretion in such cases, courts of equity may properly consider the loss to the defendant, if an injunction is granted, and if altogether greater and disproportioned to the injury to the plaintiff, it might, in some cases, be justly entitled to great weight.

THIS is a bill in equity, by Thomas Bassett, against the Salisbury Manufacturing Company, and the Salisbury Mills. The bill, originally against the Salisbury Manufacturing Company alone, was filed in June, 1861, and was amended by adding as a party defendant, the Salisbury Mills, at the December Term, 1863.

The bill alleges that on the thirtieth day of August, 1854, and ever since, the plaintiff has been lawfully seized and possessed of sundry tracts of land, eight in number, and particularly set forth and described. These lots have been numbered and known in these proceedings as follows :

1.  Prescott land, about 15 acres.
2.  Gale lot, 2 91-160 acres.
3.  Schelling lot, 33 acres.
4.  Patton lot, 1 acre.
5.  Currier & Rowell lot, 2 acres.
6.  Webster lot, 1 acre.
7.  Badger lot, 4 acres.
8.  Sweatt lot, 4 acres.

That on said August 30, 1854, the Salisbury Manufacturing Company then and ever since have maintained and kept up and continued, a certain dam over and across the Powow river, so called, at Trickling Falls, in East Kingston, and by means thereof, and by keeping the same higher than they had a right to do, knowingly, wrongfully and injuriously, during the whole of the time aforesaid, caused the water of said river, and the water falling upon and flowing into the said lands of the plaintiff to overflow, percolate through and down the same, whereby the plaintiff's grass growing on inlands, and his trees and shrubbery also growing thereon, have been damnified, killed and destroyed, the lands made spongy, rotten and impassable, and he has during said time been deprived of the use and enjoyment of said lands, and all the income and advantage which he might, and otherwise would have derived therefrom.

That the plaintiff, on September 3, 1855, commenced an action at law against the Salisbury Manufacturing Company for the damage so sustained by him, which action was entered in the court of Common Pleas for the county of Rockingham, at the November Term for that year ; was afterwards transferred to the Supreme Judicial Court, and continued from term to term until January Term, 1861, when the plaintiff recovered judgment therein against said company, upon a confession by them of the cause of action as to the second, fifth, and sixth tracts of land before described, for $40 damages, and $109.65 costs, which said judgment is not reversed or amended.

And said Salisbury Manufacturing Company pretend that they have not, since May 4, 1857, had any right, title or interest in the said dam at Trickling Falls, or in any mill, or mill privilege in said Powow river, nor maintained, interfered with, or controlled said dam, but that the same has been owned, controlled and regulated since said May 4, 1857, by the Salisbury Mills, a separate and distinct body corporate duly organized and existing under the laws of Massachusetts, over whom the defendants, the Salisbury Manufacturing Company, have no power or control, and that the two corporations combining and concocting together, pretend the Salisbury Mills alone are liable for the injuries since said May 4, 1857. Whereas the said plaintiff says that the two are one and the same corporation, and that if any deed or conveyance has been made from one to the other, it was made pending the above named suit by this plaintiff against the Salisbury Manufacturing Company, and that said Salisbury Mills is bound by the judgment therein; that said Salisbury Manufacturing Company erected and caused said dam, nuisance and obstruction of said river, and is liable to the plaintiff for all damages by him sustained thereby. And if said Salisbury Mills are a distinct corporation, they are liable to the plaintiff for all damages by him in this behalf sustained, since they had any control over, or interest in, said dam and the water raised thereby.

And the plaintiff prays that both of said corporations may be restrained from maintaining and keeping up a dam so as to cause the water aforesaid to flow, percolate through, down, or in any way injure the said lands of the plaintiff, and that the damage sustained by the plaintiff since the commencement of said suit, to wit, Sept. 3, 1855, by reason of said dam, nuisance and obstruction, may be ascertained and ordered to be paid by the defendants, as the court shall adjudge them or either of them, and for general relief.

The answer of the Salisbury Mills alleges that the Exeter company formerly owned the mills, dam and privileges, at Trickling Falls, and had the right to maintain and keep up said dam and raise the water thereby as high as said dam would then and now raise it, from October 12 to May 12, in every year forever; and on June 4, 1845, this property, and the privileges appertaining thereto, were sold and conveyed to the Salisbury Manufacturing Company.

That this company then owned large mills and manufactories on Powow river below said Trickling Falls, and needed a much larger supply of water than they had between the 12th of May and 12th of October, and wished to obtain by fair purchase the right to keep up the water through the whole year at the height it then was, of seven and a half feet above the bottom of the wasteway in said dam.

That they employed skilful engineers and surveyors to survey and take levels and ascertain what lands would be flowed or damaged by so keeping up and maintaining said dam; and after ascertaining to the best of their power what lands would be so flowed or in any way damaged, they proceeded to purchase, from all the owners of land that they could learn by such surveys and otherwise, would be flowed or damaged by so keeping up said dam, the right so to keep it up.

That the said Powow river is connected above said dam with many smaller streams and standing bodies of water, and the right to flow has been purchased of 241 land-owners, and of all that the company had reason to suppose would be affected or damaged by said dam ; and in making such purchases the company has expended $60,000, which will be wholly lost if the prayer of plaintiff's bill is granted, and that large sums have been invested in the enlargement of said mills and manufactories which require the water to be kept up in said dam in order to be operated profitably.

That before May 12, 1847, they had, as they supposed, fairly purchased of all persons interested the right to keep and maintain the said dam at all seasons of the year forever, and from that time they have so kept it up during all seasons of the year, drawing the water off therefrom during the summer months as needed for said mills, until the sale thereof to the Salisbury Mills as hereinafter mentioned ; and since such sale the Salisbury Mills have in like manner kept up and maintained said dam, and used the water therefrom.

That, August 17, 1849, the plaintiff claiming to own three tracts of land, one of about thirty-three acres, one of four acres, and the other having on it the dwelling house of Leonard S. Shelling, all purchased of said Shelling for $298.17, in order to vex and harrass the Salisbury Manufacturing Company, and extort unreasonable sums of money from them, brought a false and unfounded suit at law against said company in the county of Rockingham, for flowing the two first mentioned tracts of land, falsely pretending that they were flowed and damaged by the keeping up of said dam.

That on trial of said suit at September Term, 1852, the jury disagreed. In May, 1853, plaintiff obtained a verdict for one cent damages, by illegal evidence, by reason of which the verdict was set aside in July, 1854. In September, 1854, and again in May, 1859, the jury disagreed, and in April, 1860, the jury returned a verdict for the defendant, which was set aside on matter of law in June, 1862. April Term, 1863, the jury again disagreed, and the action is still pending, and still vexatiously prosecuted by the plaintiff.

That, after sundry trials of said suit, plaintiff instituted inquiries for any small parcels of land, of trifling value, in the extreme tracts connected with said waters, which might have been overlooked by said company in their endeavors to buy the right to maintain said dam as aforesaid, and to which it might be pretended that a nominal damage was caused by said dam, in order that he might purchase in such parcels and, under color of such nominal damages, bring other vexatious suits, and thereby extort unjust and unreasonable sums of money for the settlement of the then pending suit, and others that he might afterwards bring.

And with this design he purchased seven parcels, numbered in the bill, 1, 2, 4, 5, 6, 7 and 8, and on September 3, 1855, brought another suit against said Salisbury Manufacturing Company, for pretended damage by said dam to the same parcels of land mentioned in said bill, which suit was entered and continued till October Term, 1860, when

plaintiff struck out of his declaration the counts relating to the parcels numbered 1, 3 and 8; and thereupon the defendants, in order to end said litigation and avoid the great expense and trouble of further contending in the same, confessed at that time the plaintiff's cause of action as to the 2d, 5th and 6th counts of said declaration, and that plaintiff was entitled to recover thereon $40 and no more, and as to the residue, pleaded not guilty; that plaintiff elected to accept such confession in full of the action, it being much more than the amount of any real damage sustained; that at the next term judgment was rendered on said confession, and it has since been fully satisfied; and that this is the only judgment recovered by the plaintiff against said company. These counts 2, 5 and 6, were, for pretended damage to the tracts of land, numbered 2, 5 and 6.

That said seven tracts are remote from each other, and from plaintiff's residence; have no practical connection with each other, or any other land of the plaintiff. The parts pretended to be flowed or damaged by the dam are small in quantity, of very trifling value, and would afford no considerable or appreciable income if the dam were wholly removed; and the said parcels were purchased in as aforesaid for the sole purpose of bringing suits for damages pretended to be caused by the said dam, and not for any profit the plaintiff could derive, or expected to derive, from any honest use of them.

That as to the 1st, 3d, 4th, 7th and 8th tracts, they say that neither of the defendants have caused any damage to them by said dam, or otherwise; and as to the said 4th and 7th tracts, that during all the time covered by the second suit at law, the dam was kept up as high and as tight, and the water raised and flowed thereby as much and as high as at any time before or since; and they insist that the plaintiff, by making his election to accept said confession without answering the defendants' plea, or withdrawing his action as to the 4th and 7th parcels of land, is estopped to say that they were in any way damaged, as alleged in the declaration, and that by the disposition of that suit, the right of the owners of this dam, as to said two parcels, to keep up and maintain said dam as it was before and since said suit, is legally established.

That the tract numbered 2, containing about two and one half acres, was purchased of John Gale, November 16, 1853, for the nominal price of $125; but, as defendants are informed and believe, upon a bargain that the land should be re-conveyed for $75, after plaintiff had brought and prosecuted a suit for pretended damage to it against the company.

The parcel numbered 5, containing about two acres in Newton, six miles from plaintiff's residence, was bought by him of John Currier and John R. Rowell, August 30, 1854, for a sum not exceeding $60, and not more than one third part of it, if any, is at all affected by said dam.

The parcel numbered 6, containing about one acre, was bought of Elbridge G. Webster, July 1, 1854, for a sum not exceeding $25, and only a small part, if any is, or has been, at all affected by this dam.

The parcels numbered 2, 5 and 6, to which the confession relates, beside being of small size, widely separated from each other, of very trifling value, and no appreciable income, have boundaries not distinctly

marked, and were supposed by this company to be covered by their deeds of conveyance ; the damage, if any, is merely nominal, and may be fully and adequately compensated at law ; whatever title thereto the plaintiff may have was acquired long, to wit, more than six years, after the said dam was so kept up and maintained under a claim of right ; all which was well known to the plaintiff when he made the purchases.     Whatever title the plaintiff has to any lands that may be in any way injured or affected by said dam, was acquired with a full knowledge of the existence and effect of the dam, and for the sole purpose of making unfounded claims and instituting vexatious suits on account of pretended damages thereto, and thereby extorting unreasonable and exorbitant sums of money from the owners of said dam, for the settlement of such vexatious suits, and is tainted with maintenance, barratry and champerty.

The aforesaid surveys and examinations for the purpose of obtaining the right to maintain said dam, were matters of general interest and public notoriety in that neighborhood, and well known to the plaintiff and the persons of whom he purchased said parcels of land ; and the plaintiff and said owners well knowing the purpose of these defendants to buy of all parties interested in the said right, and that they supposed they had so purchased it, nevertheless permitted these defendants to incur large expenses in the enlargement and improvement of their said works, requiring the use of said additional water power, without giving notice that they had lands damaged by said dam ; and the plaintiff bought said tracts while the dam was maintained as high and as tight, and the water flowed thereby as high and as much, as it has been at any time since, and after it had been so kept up, under a claim of right, for a long time, to wit, for six years.

That while these defendants owned said dam they were always willing and repeatedly offered to pay a much larger sum than was reasonable or just for all damages caused by said dam, and for the right to maintain it ; and since the sale to the Salisbury Mills, they have also been willing to do so, and have offered, and hereby offer so to do, and are well able to pay all damages caused by said dam, and hereby offer and tender such security therefor as the court may order.

Before May 4, 1857, the Salisbury Manufacturing Company had become embarrassed, and for want of capital were compelled to dispose of said property, and after full notice sold it at public auction on that day, and conveyed it, including the right of maintaining said dam, to the Salisbury Mills.

That the Salisbury Mills are a corporation wholly distinct from the Salisbury Manufacturing Company, and the sale was made without any reservation or private understanding, and without any intention to avoid responsibility for maintaining said dam, or to embarrass the plaintiff in his remedy for injury caused thereby.     That there is no collusion between said companies, and since the sale the Salisbury Mills have been the sole owners, and have the entire control of said dam, and the Salisbury Manufacturing Company have had no right or control whatever ; and it was agreed that the Salisbury Mills should assume the defence of

the suits then pending against the other company, and indemnify them against the same, and also all claims for damages caused by flowing lands by the waters of the Powow river, and so these defendants say that the Salisbury Manufacturing Company are in no way concerned in the maintaining of said dam, and have no power or right to intermeddle therewith.

Whereupon these defendants, the Salisbury Mills, insist that they are improperly joined with the Salisbury Manufacturing Company, and that the amendment by which they were made parties ought not to have been allowed.

That the Salisbury Mills paid for said property $225,000, at auction, being the highest bidders, and since their purchase, for the more convenient and profitable operation of their works, they have invested in addition more than $1,500,000. That the right to maintain said dam is necessary to the profitable operation of their said works ; with the aid of this additional water power obtained by keeping up the water at all seasons of the year, the mills and works yield a fair income. If the prayer of plaintiff's bill should be granted, these defendants would not only lose the large sums expended in buying said rights, but necessarily suffer great and irreparable loss and damage by the interruption of their works.

Inasmuch, therefore, as the damage, if any, to the parcels numbered 2, 5 and 6, is *extremely trifling*, and may be adequately compensated by damages at law ; as they were purchased long after the dam had been kept up as aforesaid, with a full knowledge of the right claimed by said manufacturing company for the vexatious purpose aforesaid ; inasmuch as these defendants are willing and desirous, and have always been, and hereby offer to make full compensation for such damage, and to pay for the right far more than the real value thereof, and also to give security such as the court may order in the premises ; inasmuch as great and irreparable damage, wholly disproportioned to any caused, or pretended to be caused, by said dam to the plaintiff, would be caused to these defendants by granting the prayer of the bill, these defendants humbly submit that the court, in the exercise of their discretion, are not called upon to issue an injunction, which would stop the business and destroy the property of these defendants.

The answer of the Salisbury Manufacturing Company is much the same, although not so full.

*C. H. Bell*, *Towle*, *French*, and *J. J. Bell*, for plaintiff.

*Christie & Stickney*, for defendants.

The questions of law and fact were elaborately and ably argued in writing and orally, by C. H. Bell, and J. J. Bell, for plaintiff, and Stickney & Christie for defendants.

To the point that there was no adequate remedy at law, J. J. Bell cited *Coe* v. *Lake Co.*, 37 N. H. 254, and *Burnham* v. *Kempton*, 44 N. H. 78, 95, 102, and 2 Story's Eq. secs. 926, 927.

Upon the subject of champerty and maintenance, he cited *Haddock* v. *Wilmarth*, 5 N. H. 181 ; *Whittemore* v. *Bean*, 6 N. H. 50 ; *Willard* v. *Twitchel*, 1 N. H. 178 ; *Fenden* v. *Parker*, 11 M. & W. 675 ; *Call* v. *Calef*, 13 Met. 362 ; *Ring* v. *Coleraine*, 11 Gray 157 ; *Gowan* v. *Newell*, 1 Green. 292 ; *Frost* v. *Paine*, 12 Me. (3 Fairf. 111 ;) *Wickham* v. *Conklin*, 8 Johns. 220 ; *Danforth* v. *Streeter*, 28 Vt. 490 ; 2 Roll. Abr. 115, 118 ; Vin. Abr. Maintenance G. O. ; Story's Eq. Jur. sec. 1048, and seq., and notes and cases ; 4 Bac. Abr. Maintenance B. ; 4 Kent's Com. 448 ; and Buller, J. 4 T. R. 340.

Stickney, for defendants, urged that plaintiff was not entitled to an injunction, although his title had been established at law, and cited *Wason* v. *Sanborn*, 45 N. H. 169, and cases.

Bellows, J.   This bill in equity is brought to compel the defendants to permit the water in Powow river to pass, from May 12 to Oct. 12, in each year, without obstruction from their dam, upon the ground, that, otherwise, eight tracts of land of the plaintiff will be overflowed and injured.

The plaintiff alleges that the injury to these lands is in its nature irreparable, and that as to the tracts numbered two, five and six, the title of the plaintiff has already been established in a suit at law.

On the other hand, the defendants deny that the injury, if any there be, is in its nature irreparable, but insist that it may be adequately redressed at law ; and that although a judgment at law has been obtained by the plaintiff against the Salisbury Manufacturing Company for injuries to the tracts numbered two, five and six, upon the defendants' confession, yet that in point of fact the value of those lots is very small, and the injury merely nominal.

Upon a careful examination of the proofs in the cause, it appears that since August 17, 1849, a suit at law has been pending in favor of this plaintiff against the Salisbury Manufacturing Company, for flowing by means of the same dam the plaintiff's land known as the Schelling land, and containing about thirty-seven acres ; and it is to this tract that the principal injury is supposed to be done.   During the pendency of this suit there have been six jury trials, and four times the jury have disagreed ; once, they found a verdict for the plaintiff for one cent damages, and once a general verdict for the defendants, both of which were set aside.

This land has the general character of swamp land, and none of it cultivated, and the plaintiff's case is, that much of it has been flowed by the defendants' dam, and that by keeping up the water the natural draining has been obstructed.   This is denied by the defendants, and this is the question submitted to the jury.

Under these circumstances, we are satisfied that in respect to this land there is no call for the interposition of a court of equity by way of injunction.

It appears, further, that on the third day of September, 1855, the plaintiff brought another suit against the Salisbury Manufacturing Com-

pany for flowing the eight several tracts of land described in this bill, which was entered and continued from term to term, until October Term, 1860, when the defendants confessed the plaintiff's cause of action as to the tracts of land numbered two, five and six, and that he was entitled to recover damages to the amount of forty dollars, and no more, and as to the residue, pleaded not guilty. This confession the plaintiff accepted, remitting the residue of his claim, and judgment was rendered accordingly at the January Term, 1861. It may be observed, however, that it is assumed in the argument that, previous to the confession, the plaintiff had struck out of his declaration the counts embracing the tracts numbered one, three and eight, although we do not find it so stated in the record. In the view we take of the case, however, we do not deem this important.

In regard to these tracts numbered one, four, seven and eight, we think no case is made for the exercise of the extraordinary power of a court of equity which is invoked by this bill; and this conclusion is independent of the effect of accepting the confession, which we do not find it necessary to consider.

There remains, then, for consideration, only the question in respect to the tracts of land numbered two, six and seven, for injuries to which by means of defendants' dam, the plaintiff has recovered judgment in a suit at law upon defendants' confession.

Upon examining the proofs in the cause, it appears that the original suit was brought and the trials had as stated in the answer, and with the results therein set forth, and that the three tracts of land numbered two, six and seven, were purchased by the plaintiff at the times stated in the answer, that the three lots contain in all five acres and ninety-one rods, and that the plaintiff paid for them two hundred and seven dollars.

And we think the weight of the evidence is, that these lands were purchased by the plaintiff with the view of obtaining tracts that were surely flowed by the company's dam, and with the purpose to use them to bring the company to terms in respect to the lands embraced in the original suit. Indeed, the plaintiff himself testifies that he took a reasonable common sense view of it; that he supposed he had lands that were flowed and damaged by the company, and the company would not acknowledge damages to any of them; and he came to the conclusion that as they were buying land to keep water on him without acknowledging any flowage, he would buy land to keep it off until he could control the whole flowage, if possible. Again, he says, he bought these lands to control his peat lands that were flowed, and if law and justice won't assist him in freeing his own lands, he would free them himself; and upon the whole, we are satisfied that these three lots were purchased in the belief that they were clearly flowed by the defendants' dam, and with the view to use them to enforce an adjustment of the plaintiff's claims on account of the alleged injury to the lands embraced in the first suit.

The grounds of defence set up by the answer in respect to these three lots are :

I. That the Salisbury Manufacturing Company claimed and exer-

cised the right to keep up the water in their dam at all seasons of the year, upon the ground that they had purchased the right so to do of all the land owners, and had made expensive additions to their manufacturing operations, relying upon the additional water power so acquired ; and that the owners of these lands well knowing these facts, for about six years, permitted said company so to use said dam and enlarge their works, without giving them any notice that they' had lands that were flowed.

II.   That the damages to these lands, if any, are merely nominal, and the remedy at law is adequate.

III.   That the title of the plaintiff to these lands was obtained in such way and for such a purpose, that a court of equity should decline to lend its aid by way of injunction.

In regard to the first position, it appears that before the plaintiff brought his suit for flowing these three lots, and the other five, which was in September, 1855, the Salisbury Manufacturing Company had kept up their dam during the entire year, for seven or eight years, and about six years before the plaintiff purchased either of the three lots in question ; and we think the weight of the evidence is that it was so kept up under a claim of right, the company supposing they had purchased in the right to flow all the lands that would be affected.   The proof is satisfactory that the company made very extensive surveys and levels to ascertain what lands would be affected, and took measures to purchase all such, and did in fact purchase a very large number, more than two hundred in all, and at a heavy expense ; and from the evidence before us, we think it might well have been supposed that all had been obtained, and consequently that the water was kept up in the dam under a claim of right.

It is alleged in the answer that the defendants expended large sums of money in enlarging their works upon the strength of the additional power so acquired, without notice or objection ; and upon the proofs exhibited it appears that between the years 1847 and 1854, inclusive, the Salisbury Manufacturing Company made large additions to their mills and machinery, and at great expense, and that since the year 1854, and before the filing of the bill in this case, that company and the Salisbury Mills have continued to expend large sums, amounting in all to about $850,000, in enlarging their works, so that all the additional power derived by keeping up the water at the aforesaid dam is put in requisition to propel their machinery.

It being found, then, that the water was kept up, and used, nearly eight years before the suit at law of Sept. 3, 1855, under a claim of right, and that large and expensive additions were made to the defendants' mills and machinery, requiring an additional supply of water, the question is, whether it was with the knowledge and acquiescence of the owners of these three lots of land.

Upon this point, it appears that previous to 1847, the water had not been kept up between May 12 and October 12, in each year, but after that the water was kept up through the entire year, the dam being about seven and one half feet high ; and this, of course, would make a marked

change in the condition of the water near the dam, and the owners of land overflowed in consequence would ordinarily be presumed to have notice of that fact, and that it was so flowed under a claim of right. So that if this continued for twenty years without interruption, a title would be gained; and this necessarily supposes that the occupation and use of such land has been of that open and visible character as to give notice to the owner; the same as in the case of land not covered by water, in which case an open and visible occupation is conclusive upon the point of notice; and even in the case of an unregistered deed such occupation will charge with notice a subsequent purchaser, or an attaching creditor. In respect to these three lots there is nothing to distinguish the occupation from the ordinary cases of flowage, and we therefore think the owners of those lots are to be charged with notice.

As to the matter of acquiescence by those land-owners, it is to be remarked that there is no evidence of any objection by any of them, until after the plaintiff purchased the lots, and in the absence of such evidence, we may fairly assume that no objection was made. In respect to the lot numbered two, or the Gale lot, the plaintiff made his purchase November 15, 1853, and there is no direct testimony on the point whether objections were made by Mr. Gale, although his deposition was taken. From the testimony of Dr. Bassett, it appears that on the seventeenth day of October, 1854, almost a year after his purchase of this lot, he opened a correspondence with the company upon the subject of flowing his lands.

In respect to lot numbered five, or the Currier & Rowell land, the evidence tends to show that Phillip Whittier, who was engaged in settling for flowage with land-owners under Mr. Derby, agent for the Salisbury Manufacturing Company in 1853, called upon one Merrill, then the owner of this lot, for the purpose of settling with him, and was informed by him that he had no land that was flowed.

In regard to the lot numbered six, or the Webster lot, which was bought by the plaintiff July 1, 1854, of Mr. Webster, who had owned it since the fall of 1853, it appears from his deposition that while he owned it he made no claim for damages, although he had an idea that his line extended into the flowed ground, and that if he kept the land he should have gone and got damages of the company.

From this evidence, and the absence of any proof of objection by the owners of these lots until the fall of 1854, when the plaintiff opened a correspondence with the company, we are satisfied that the company kept up the water in their dam the entire year, for about seven years, under a claim of right to do so, and with notice to the owners of these lands, actual or constructive, and with their acquiescence during that time.

It is claimed by the plaintiff that the injury to his lands is, in its nature, irreparable; but this is denied by the defendants, who allege that it is merely nominal. The proofs show that lot numbered two, or the Gale tract, lies on both sides of a brook emptying into the Powow river, a short distance above defendants' dam. Its form is an oblong square, and the brook passes across it, somewhere near the middle of its length.

The whole tract is about two and one half acres, and when the dam is full the water in the brook on this land is about ten rods long and four rods wide; and there is no evidence that any income had ever been derived from the parts so flowed. The witness who furnishes the plan of this land, Mr. Wiggin, says, that he was there once when the pond was down, and there was no water in the brook.

The tract numbered five, or the Currier & Rowell lot, contains about two acres, and lies in, or upon, Country pond. It appears from the testimony of Mr. Wiggin, that when the defendants' dam is full, about one-fourth of an acre of this land, at a place called the bog, is flowed, and eleven and three-fourths rods at the other end is also flowed. It was conveyed to the plaintiff, August 30, 1854, reserving the wood on the lot, with the right to remove it in three years; and there is no evidence of any income being derived from the land in any other way.

The lot numbered six, or the Webster lot, contains one acre, and was purchased July 1, 1854, for $25, and lies on the margin of a cove in the Powow river, near the dam. When the bargain was made for it, the plaintiff and Webster examined it, and the plaintiff pointed out what he wished to buy for a larger price, saying he wanted it for the flowage. It appears from the testimony of the grantor that the bank was steep, and that there was nothing on the upland when he sold, and that the line towards the water was uncertain, and that plaintiff had made no use of the land since he bought it.

From this statement of the evidence it is manifest that the injury is not of the character that would call for the interference of a court of equity when the plaintiff's title had not been established at law; such is clearly the doctrine of *Coe* v. *Lake Co.*, 37 N. H. 255, *Wason* v. *Sanborn*, 45 N. H. 169, *Eastman* v. *Amoskeag Man. Co.*, 47 N. H. 71; and the question is, whether a judgment in a suit at law establishing that title would justify an injunction under the circumstances of this case. This involves an inquiry into the general principles which guide the discretion of courts of equity upon applications of this sort.

The power to grant injunctions to prevent injustice has always been regarded as peculiar and extraordinary. It is not controlled by arbitrary and technical rules, but the application for its exercise is addressed to the conscience and sound discretion of the court. Ordinarily, it will not be exercised when the right of the complainant is doubtful, and has not been settled at law; and even when it has been so settled, an injunction will not be granted when the remedy at law is adequate. It is not enough that an injury merely nominal or theoretical is apprehended, even although an action at law might be maintained for it; but to justify the interposition of this summary power, there must be cause to fear substantial and serious damage, for which courts of law could furnish no adequate remedy. What injuries shall be regarded as irreparable at law must depend upon the circumstances of the particular case. If the injury be trivial, as by slightly darkening a neighbor's windows, or raising the water of a river a few inches upon his rocky shore, doing him no appreciable or serious damage, equity would not ordinarily interfere by injunction; even in cases where the right had been established at

law, for the power is extraordinary in its character, and is to be exercised in general only in cases of necessity, and when the court can see that other remedies are inadequate to do justice between the parties; and even then it is to be exercised with great care and discretion.

If the granting of an injunction would necessarily cause great loss to the defendant, a loss altogether disproportioned to the injury sustained by the plaintiff, that fact should be considered in determining whether the application should be granted, and in some cases it would justly have great weight.

It has often been supposed that when the right has been established at law the plaintiff would be entitled to an injunction as matter of course; and this misapprehension has arisen probably from the fact that in a large number of cases injunctions have been refused upon the express ground that the title of the plaintiff had not been established at law, leaving room for the inference that if it had been so established, the injunction would have been issued.

This, however, is clearly not the doctrine of courts of equity, for they will not ordinarily exercise this summary and extraordinary power, when substantial justice can be done by courts of law.

Such is the doctrine of our own courts, as held in the recent case of *Wason* v. *Sanborn & al.*, 45 N. H. 169, and *Eastman* v. *Amoskeag Man. Co.*, 47 N. H. 71; and so it is distinctly held in *Wood* v. *Sutcliffe*, 2 Simons N. S. 163. In *Wason* v. *Sanborn & al.*, it was laid down by *Bell, C. J.*, that to authorize the court's interference by injunction there should appear imminent danger of great and irreparable damage, and not of that for which an action at law would furnish full indemnity. In *Eastman* v. *Amoskeag Man. Co.*, *Nesmith, J.*, says plaintiff show a case of strong and clear injustice, of pressing necessities, and imminent danger of great and irreparable damage.

In the *Attorney General* v. *Nichol*, 16 Ves. 337, it was held that an injunction against darkening ancient windows would not be granted in every case affecting the value of a building, though an action at law might lie. *Lord Eldon* says that the foundation of equity jurisdiction to interfere by injunction, is that sort of material injury to the comfort of those who dwell in the neighboring house, requiring the application of a power to prevent, as well as remedy, an evil; and again, he says, he repeats the observation of *Lord Hardwicke*, that the diminution of the value of the premises is not a ground; and there is as little doubt that this court will not interpose upon every degree of darkening ancient lights and windows. At the same time he holds that an action in the case might be maintained in many cases which would not support an injunction, and proof, therefore, that the ancient lights were darkened without showing how much, was not sufficient. This case, it will be seen, was decided without regard to the fact whether the title was, or was not, established at law.

In 2 Story's Eq. Jur. sec. 925, it is said that it is not every case that will furnish a right of action against a party for a nuisance, that will justify the interposition of courts of equity to redress the injury, or to remove the nuisance; but there must be such an injury as from its na-

ture is not susceptible of being adequately compensated by damages at law; or such as from its continuance or permanent mischief, must occasion a constantly recurring grievance which cannot be otherwise prevented by an injunction; and he lays it down that a mere diminution of the value of property by the nuisance without irreparable mischief, will not furnish any ground for equitable relief.    So is *Dunn* v. *Valentine*, 5 Met. 8, where it was held that the owner of a vacant house lot was not entitled to an injunction to restrain the exercise of an offensive trade near it, although it might diminish the value of the lot, upon the ground that the remedy at law was adequate.

In *Begalow* v. *Hartford Bridge Co.*, 14 Conn. 565, it was held that to authorize an interference by injunction there must be not only a violation of the plaintiff's rights, but such a violation as is, or will be, attended with substantial and serious damage, and not merely a technical or inconsequential injury, even although an action at law might be maintained for it; and therefore the court refused to restrain the building of a causeway that would cause the water of Connecticut river to rise more rapidly and higher on plaintiff's land than it otherwise would, it not appearing that it would materially affect the productions or injure the buildings.    See, also, *Attorney General* v. *Cleaver*, 18 Ves. 210, and cases; *Hanson* v. *Gardner*, 7 Ves. 305, and notes; *Shreeve* v. *Voorhees*, 2 Green. Ch. 25; 2 U. S. Dig. 374, sec. 102; *Van Winkle* v. *Curtis*, 2 Green. Ch. 422.

To the point that the application is addressed to the sound discretion of the court, are *Riddall* v. *Bryan*, 14 Md. 444; 20 U. S. Dig. 530, sec. 9; *Gray* v. *Ohio & Penn. Railroad*, 1 *Grant's Cases*, (Penn.) 412; 19 U. S. Dig. 380.

Another principle which is held to govern the discretion of the court in these cases, is that the application for the injunction must be seasonably made; and therefore if it appear that the owner of the property supposed to be affected by a nuisance has allowed it to exist for several years, with knowledge of its existence, and without any objection, and especially, if he has acquiesced in the claim of another to use and enjoy the subject of complaint as of right, and to expend money upon the strength of it, with his knowledge and without objection, courts of equity will decline to grant an injunction, but leave him to his remedy at law.    Nor would it be necessary that this acquiescence should be such as to be a defence to a suit at law, although if a party stands by and sees another expend large sums of money in erecting what might in fact be a nuisance, and such party is aware that the other supposes he has the right to do what he is doing, and yet such party makes no objection, although aware of his rights, he would be estopped both at law and equity.    So is *Odlin* v. *Gove*, 41 N. H. 465.

In the absence, however, of what would constitute an equitable estoppel, courts will ordinarily decline to exercise this summary power, unless the party invoking it has used due diligence in making his application.

In *The Rochdale Canal Co.* v. *King*, 2 Simons N. S. 78, this doctrine was fully recognized.    There the defendant had taken from the

plaintiffs' canal, water for *making and condensing* steam used by them to operate their mills, upon the banks of the canal, when, by the law creating the canal corporation, the defendant had the right to take the water only for the purpose of *condensing* steam. It appeared that the defendant's mills were built in 1830, and water drawn from the canal for condensing steam, and also for generating it, and for other purposes, from that time down to 1847, with the plaintiff's knowledge and without objection until then, and that defendant incurred great expense in constructing his works, relying upon the water so ˙obtained. In 1848, the plaintiffs brought an action at law against the defendant for using the water for other purposes than for condensing steam, and obtained a verdict for one shilling damages, upon which judgment was eventually rendered. This bill for an injunction was filed in February, 1851, and the court decided, that, after such acquiescence, the plaintiffs were not entitled to relief in equity, notwithstanding they had established their right at law. The decision went entirely upon the ground of the acquiescence of the plaintiffs which deprived them of the right to the aid of a court of equity, whether it was a good defence at law or not.

In *Wood* v. *Sutcliffe*, 2 Simons N. S. 163, an injunction was refused mainly upon the ground that the plaintiff stood by while defendant was constructing his works, and suffered him to use them from the beginning of 1845, until the beginning of 1850, without giving him any hint that he was doing what he had not a lawful right to do. The application was to restrain the defendant from pouring into the stream, on which both plaintiff and defendant had mills, the refuse from defendant's mill, the plaintiff having established his right in 1850, by a suit at law, although the damages recovered were only nominal.

It appeared, also, that other mill owners discharged their refuse into the same stream, and were paying to the plaintiff for the privilege of doing so, at the rate of £2 per annum per horse power, having made that arrangement to avoid litigation. The Vice Chancellor was of the opinion that the injury might be compensated in money, and that the injunction ought to be refused on that ground, holding that as the plaintiff desired to apply a certain pressure to bring the defendant to terms, he ought to be left to the pressure which may be applied by means of an action at law.

In the case of the *Birmingham Canal Co.* v. *Lloyd*, 18 Ves. 515, where the danger apprehended was of a very serious nature, the drawing off the water of a great reservoir of the canal, the injunction was refused by Lord Eldon because the plaintiff had delayed coming to the court till two years after notice from the defendants that they proposed to work their colliery, during which two years they had expended £2000, in providing engines, &c., for their works; although the plaintiffs on receiving the notice had notified the defendants that a suit at law would be commenced if they proceeded to open the levels or channels connected with the reservoir.

So in *Ripon & al.* v. *Hobart*, 3 Mylne & K. 169, where an injunction was sought to restrain the defendants from erecting a steam engine for the purpose of raising water from certain low lands which they

wished to drain, and throwing it into the river Wetham, to the great injury, as the plaintiffs alleged, of the banks of that river, which plaintiffs were bound to keep in repair, to prevent the flooding of the lands adjoining, it was held that due diligence had not been used by the plaintiffs, they having delayed application for the injunction for the space of nine months after defendants had commenced and made considerable progress and expended money therein. In both of these cases, the right of the plaintiffs had not been established at law, but the injury apprehended in both cases was of a very serious character and irreparable in its nature.

*Barrett* v. *Blagrave*, 6 Ves. 104, was an application for an injunction to restrain the breach of a covenant, but it was refused upon the ground, that, after eleven years acquiescence, the plaintiffs must take their chance at law.

In *Binney's Case*, 2 Bland. Ch. 99, (Md.) it is held that to authorize an injunction it must appear that the applicant has acted promptly, and has not impliedly authorized what he now objects to, by his laches or acquiescence. If he applies to stay operations upon a large and costly work, it should appear that he applied for an injunction as soon as he became apprised of his rights and the extent of the threatened injury. See abstract in 2 U. S. Equity Dig. 65, secs. 17, 18.

So, standing by and seeing money expended in erecting mills to be operated by a certain stream, without objection, is a waiver. *Jacox* v. *Clark*, Walk. Ch. 249, (Mich.;) 2 U. S. Eq. Dig. 70, sec. 137.

So acquiescence may defeat the application for an injunction, though not sufficient to defeat a suit at law. *Gray* v. *Ohio & Penn. Railroad*, 1 Grant's Cases, 412; see, also, *Dunn* v. *Sprevier*, 7 Ves. 235, and notes.

Upon these principles we are satisfied that an injunction ought not to be granted.

In the first place, we think that the injury to these three lots of land is not of such serious and irreparable character as to demand the interference of this court by way of injunction, especially in view of the serious loss and damage it would naturally cause the defendants; arming, as it must necessarily do, the plaintiff with the power of exacting from the defendants large sums of money, limited as it would seem only by his sense of what he could conscientiously ask as an indemnity for the injury to all these lands, and the expenses attending the long protracted litigation, including the services bestowed by himself in the prosecution of the several suits between them. Independent, however, of the effect upon the defendants, we think that, in respect to the three lots, the plaintiff has an adequate remedy at law. In the most serious aspect in which it can be viewed, the injury to these lands is but trifling. The prices paid for the whole five and a half acres was $207, about $37.50 per acre, mostly selected from larger pieces with a view to flowage. Of this quantity a little more than a half an acre appears to be flowed in two places, one quarter of an acre each; in one eleven and three-fourths rods, and another a piece of a steep bank, how much does not appear. These pieces are not shown to be productive, or that they ever were; on

the contrary, most of it appears to be wet or swamp land; and it does not appear that they are connected with other lands so as to make it essential that the water should be withdrawn during the summer months; and it will be observed that defendants have the right to keep up the water from October 12 to May 12, in each year.

We cannot, under these circumstances, regard the injury as of such a serious character as to call for the interference of this court. On the contrary, we regard it as nothing more than an ordinary case of a diminution of the value of land which can be adequately compensated at law; and in this we are sustained by the case of *Wason* v. *Sanborn & al.*, and *Eastman* v. *Amoskeag Man. Co.*, before cited.

Upon the ground of acquiescence or laches, we think the injunction ought not to be granted. For seven or eight years the owners of these lands have stood by and witnessed the flowing of them without objection; and although it may not constitute a good defence to a suit at law, it furnishes a decisive objection to the interposition of a court of equity. The authorities already cited establish the general rule, and there is nothing to take this case out of it. There was clearly an acquiescence of seven or eight years before any hint was given of any claim for compensation, and under circumstances, too, that called for notice, if any substantial injury was sustained; and during this time the Salisbury Manufacturing Company expended large sums in extending their works.

In several of the cases cited an injunction was refused when the acquiescence was for a much shorter time; and we are satisfied that there is nothing here to distinguish the case favorably for the plaintiff, from many of the cases cited.

In addition to these grounds for refusing an injunction, the purpose and object for which the plaintiff purchased these three lots of land are entitled to great consideration in determining the exercise of the discretion vested in a court of equity. It is manifest, from the character of these small parcels themselves as well as from the direct proofs, that they were not purchased for cultivation or for any ordinary use, but as the means of bringing the defendants to terms in respect to larger tracts of land, before any of these purchasers, the owners, with a knowledge of the facts had acquiesced, for six or seven years, in the claim and use made by the defendants. In equity, therefore, at least, the claim which he purchased must be regarded as somewhat stale, and on an application to the discretion of this court to prevent injustice, the fact that such purchases were so made and for the objects shown by the proofs, would be a strong, if not decisive, objection to the granting of an injunction. We are not prepared to say that this objection would be insuperable, but we think it is safe to say, that a very strong case in other respects would be required to overcome the repugnance of the court to lend its aid in this way to enforce rights so acquired.

Had these lands been purchased for cultivation, for house lots or other legitimate use, and the real object of this application had been to relieve the land from the effects of the defendants' dam, a different case would have been presented; but here small parcels were selected of little value, and for the avowed purpose of bringing the defendants to terms in re-

spect to plaintiff's claim for flowing other lands, which claim, after a se-
vere litigation for several years, he had been unable to establish at law.

To aid in such pressure by exerting the extraordinary powers of a
court of equity, would be, we think, oppressive and unjust, and finds
no countenance in the course of that court.

*Woods* v. *Sutcliffe*, 2 Simons Ch. 169, was a bill to restrain the
defendant from polluting the waters of a certain river by pouring into it
the waste from their mills; but it appearing that the plaintiff had li-
censed other mill owners to put similar waste into the same stream, and
that the object of this bill was to bring defendants to terms and compel
them to pay for the privilege, the court say, "if the plaintiffs desire to
apply to the defendants a certain pressure in order to bring them to
terms, I think I ought to leave plaintiffs to that pressure which may be
applied by means of an action or actions at law;" saying that if a jury,
in a trial at law, thought the defendants ought to come to terms, they
might give £50 or £100 damages, instead of a farthing.

In that case, it will be observed that the plaintiff's right had been es-
tablished at law, as it has been in this case, and there was no objection
to their mode of acquiring title to their mills, which were alleged to be
affected by the pollution; yet because the real object of the bill was to
compel the defendants to pay for the privilege of pouring the waste into
the river, and not to prevent its being done, the Vice Chancellor thought
the injunction ought not to be granted.

Among the prominent reasons for granting an injunction, the plaintiff
contends that the injury to his peat meadow is irreparable, and that he
has no adequate remedy for it at law. We think, however, as before
stated, that, under the circumstances of this case, this court cannot inter-
fere. If a clear case of irreparable injury and urgent necessity were
shown, upon the ground that a court of law could furnish no adequate
remedy, a court of equity might properly interfere in some form, but
such a case is, we think, not made here.

In the trial of the action at law for flowing this land, there have been
six trials by a jury from September, 1852, to April, 1863, in four of
which the jury failed to agree. In May, 1853, there was a verdict for
the plaintiff for one cent damages, which was set aside July, 1854; this
trial went upon the ground, that, if the defendants' dam caused the water
of Powow river to overflow this land, or the waters running into it, to
remain on it longer than they otherwise would, or if the dam actually
and perceptibly kept water upon his land and made it wetter than it oth-
erwise would have been, the plaintiff was entitled to recover.

At the trial in April, 1860, a verdict was found for the defendants,
but the jury was instructed that if the defendants, by their dam, threw
any water back on to, or into, the plaintiff's land, they were liable; but
they were not liable for merely stopping the surface drainage, or the
underground, percolating drainage, where there was no water course.
On account of these instructions, the verdict was set aside, and the law
settled to be, that, if the dam obstructed the natural drainage of the land,
the defendants would be liable, unless such obstruction was caused by
them in the reasonable use or management of their own land or privi-

lege; and that what is such reasonable use or management is, ordinarily, a mixed question of law and fact.

Upon the law as thus laid down, the jury, at April Term, 1863, disagreed, and it might be because they could not agree upon the questions whether the water was flowed back on to plaintiff's land, or the natural drainage was obstructed, or whether, if it was obstructed, it was so in the reasonable use of the defendants' land and privilege.

When the jury agreed for the plaintiff, at May Term, 1853, their verdict merely found that the plaintiff's land was made wetter by the dam, while the verdict for the defendants in 1860, merely found that the dam had not caused the water of the river to overflow the plaintiff's land. Upon the real questions involved, the action of the jury has left the matter in doubt; and there is nothing in the proofs before us, either as to the fact of injury having been done, or the nature of it if any is done, which is of that decisive character that would justify the granting of an injunction; and we have no hesitation in saying that these questions must de determined at law.

In respect to the other lands described in the bill, except the tracts numbered two, five and six, most of them are swamp lands, and in the near neighborhood of the principal tract, and with the exception of the peat meadow, are of a similar character. If injured at all by the dam, and that question stands much as it does in respect to the principal tract, the nature of the injury must be very similar to the injury to the three tracts numbered two, five and six, and can be adequately compensated at law.

Our conclusion, therefore, is, that the bill must be dismissed.