Dickman, J.
On January 22, 1889, the general assembly passed an act (86 Ohio Laws, 7) entitled, “ An act to authorize cities of the third grade of the first class to borrow money and issue bonds therefor, for the purpose of procuring territory and right of way, sinking wells for natural gas, purchasing wells and natural gas works, purchasing and laying pipes, and supplying such cities with natural gas for public and private use and consumption.” Under the authority given by this act, and in pursuance of ordinances passed hy its common council, the city of Toledo — after submitting the question to a vote of the qualified electors of the city, and thereby obtaining their approval — issued its bonds to the amount of seven hundred and fifty thousand dollars, and of such issue, sold upon the general market bonds to the amount of two hundred and ninety-two thousand five hundred dollars. The money thus realized has been expended in procuring territory and right of way — in sinking and purchasing gas wells — in buying and laying pipes, with the fixtures, attachments, machinery and buildings necessary to the transportation of natural gas to the city; and the main line has been completed more than half the distance from the gas fields to Toledo, and the remainder of the line is now in process of construction. In issuing and selling its bonds for such purpose, and imposing taxes for their payment, the city, it is alleged, is assuming to use and enjoy a privilege and franchise that is without authority of law, and it is sought by this jjroceeding in qua 'warranto, to oust and exclude the municipality from- engaging in what is claimed to be an unlawful enterprise.
The act of January 22, 1889, it is contended, is unconstitu *127 tional and void for the alleged reasons, that it is a special act conferring corporate powers; that it does not come within the scope of legislative power vested in the general assembly; and that the operation of the act is to impair the obligation of a contract entered into by the passage of city ordinances, between the city of Toledo and the Northwestern Ohio Natural Gas Company — a private corporation engaged in supplying Toledo with natural gas.
I. The first section of the act whose validity is called in question, provides : “ That any city of the third grade of the first class in the state of Ohio shall be, and is hereby authorized to issue its bonds for an amount not exceeding seven hundred and fifty thousand dollars, for the purpose,” etc. The second section requires, that before such bonds or any of them shall be issued by any such city, the question of issuing the same shall be submitted to a vote of the qualified electors of such city, at any géneral or municipal election to be held therein. The third section, which, by prescribing the time within which notice of the submission of the question of issuing bonds is to be published, has the effect, it is claimed, of rendering the entire act limited and special in its operation, reads as follows: “ The mayor of any such city, before the next general or municipal election after the passage of this act, shall cause public notice of the submission of said question to be published in all the newspapers published and of general circulation therein, for at least ten days prior to such election. And said election shall be held, proclamation thereof and returns thereof made, in all respects, not otherwise herein provided, as municipal elections are now required by law to be held and returned in such cities.”
By section 8, therefore, of the act, the mayor was clothed with power to submit the question to be voted upon at the election held either on the first Monday of April, 1889, or on the first Tuesday after the first Monday in November, 1889 —being the days on which the next municipal and general elections were to be held after the passage of the act. The argument is, that by the federal census of 1870, under which there was a general classification of municipal corporations, *128 Toledo was the only city in the state, of the third grade of the first class, and although at the passage of the act of January, 1889, other cities had the requisite population to be advanced to that grade and class, they could not have been so advanced in sufficient time before the general or municipal election after the passage of the act, as they must have first passed through a fourth grade of the first class established by the Revised Statutes. Hence it is urged, that the act of January 22, 1889, is an act conferring corporate powers, and essentially special in its nature; that it was not enacted or intended to apply to any other city than Toledo; and that consequently it is in conflict with the requirement of section 1, article 18 of the constitution, which provides that, “ The general assembly shall pass no special act conferring corporate powers.”
In our view, the act under consideration was not so limited in the period of its operation, that only one city, to wit, the city of Toledo, could be brought within the sphere of its classification. This conclusion results from the construction which, we think, should be given to certain sections of the Revised Statutes governing the classification and advancement of municipal corporations. By section 1546, “ cities are divided into two classes, first and second; cities of the first class are divided into three grades, first, second, and third; cities of the second class are divided into four grades, first, second, third and fourth; cities of the second class, which hereafter become cities of the first class, shall constitute the fourth grade of the latter class.” There is here an allusion to a fourth grade of the first class, but no such grade is expressly established by the statute, nor have counsel called our attention to any laws enacted for the government of cities of the fourth grade of the first class, eo nomine. This section is in pari materia with the following section, 1547, which provides as follows: “ Existing corporations, organized as cities of the first class, shall remain such, and their grades, and the grades of those which may be, or may become, cities of the first class, shall be determined as follows : those which on the first day of July, in any year, have, *129 according to an official report or abstract of the then next preceding federal census, more than thirty-one thousand five hundred, and less than ninety thousand inhabitants, shall constitute the third grade.”
It is clear from the language of the section last cited, that as soon as a city has reached a population of more than thirty-one thousand five hundred and less than ninety thousand, it is permitted by reason of the number of its inhabitants, to be advanced to the third grade of the first class, without passing through an intermediate or fourth grade. The third grade to which it is thus entitled, is fixed and determined by a numerical standard of population, — as precisely as the age of majority is fixed for individuals — and not by a previous probationary existence in a lower grade. But, though allowed to become a city of the third grade of the first class, it becomes so, not by simple increase of population, but by taking the regular steps prescribed by the Revised Statutes. The State ex rel. Attorney General v. Wall et al., 47 Ohio St. 499. Any cities of the second class, as classified and graded by section 1548, which, on the first day of July, 1888, according to an official report or abstract of the federal census of 1880, contained more than thirty-one thousand five hundred and less than ninety thousand inhabitants, might, by taking the initiative at the next annual election of city officers, and complying with the provisions of sections 1582 to 1588 inclusive, have perfected their advancement to the third grade of the first class, before the general election of 1889, and thus have been embraced among the municipalities authorized by the act to issue their bonds for procuring a supply of natural gas.
It is insisted, however, that the clause in section 1546, by which cities of the second class that become cities of the first class are made to constitute the fourth grade of the latter class, precludes the idea of entering directly into the third grade of the first class without passing through an intermediate stage. There is añ apparent repugnancy between the words of that clause and the plain enactment in section 1547, that cities which have a given number of inhabitants *130 shall constitute the third grade. But, if the provisions in the two sections are to be deemed mutually repugnant, the general rule of statutory construction requires that the section or passage last in position shall prevail. Endlich on Interpretation of Stats., § 188; Maxwell on Interpretation of Stats., 186; Johnson v. Byrd, 1 Hemps. 434; Powers v. Barney, 5 Blatch. C. C. 202; Maddox v. Graham, 2 Metc. (Ky.) 56, 76; Edgar v. Greer, 8 Clark (Ia.) 394.
Still, we would not lose sight of another rule of interpretation, that where several parts of a statute seem inconsistent and irreconcilable, the whole statute is to be so construed, that all its provisions may be harmonized if possible. Without considering whether the word “ fourth ” in the clause of section 1546, “ shall constitute the fourth grade ” of the first class, was a clerical error and should be read “ third,” the question arises, what cities would constitute the fourth grade of the first class, within the contemplation of the statute. Section 1551, which enacts that, “ A city of the second class shall not be advanced to the first class until it attains a population of twenty thousand inhabitants,” evidently was not intended to place a city of that population and of less than thirty-one thousand five hundred, in the third grade of the first class. But, an advancement to a fourth grade of the first class would be a natural transition from the second class, for cities that have reached only twenty thousand inhabitants ; and the transition would be equally natural for cities of more than thirty-one thousand five hundred inhabitants, to go directly from the second class into the third grade of the first class. Any city of the second class, however, under existing legislation (85 Ohio Laws, 130) upon passing into such fourth grade, would be governed by the laws in force for the government of such city of the second class at the time the change in grade and class occurs, until the enactment of laws for the government of cities of the fourth grade of the first class. When we consider the unambiguous terms in which section 1547 fixes the grades of the first class, it would not be unreasonable to conclude, that the legislature had in view the establishment of a fourth grade of the first *131 class, to which only cities of twenty thousand and less than thirty-one thousand five hundred inhabitants might be advanced, leaving the third grade of the first class directly open only to cities of the second class, that have more than thirty-one thousand five hundred and less than ninety thousand inhabitants, and that take the necessary steps for a direct advancement as required by statute. The fact that a city of twenty thousand inhabitants, occupying a minor grade in the second class, may nevertheless directly advance to a fourth grade in the first class, evidences, that intervening grades established by the statute are not barriers which a city of the second class cannot skip or pass over, in entering a grade of the first class.
II. The act of the general assembly under consideration provides, that if the proposition to issue the natural gas bonds shall be approved by sixty per cent, of those voting upon the proposition, the city shall be authorized to issue the bonds; and to pay the principal and the interest upon such bonds, and provide a sinking fund for their gradual redemption, the council of the municipality is authorized to levy a tax annually on the taxable property within the city. It is contended in argument, that by section 19, article 1, of the constitution, “ Private property shall ever be held inviolate, but subservient to the public welfare; ” that the taxation thus authorized by the act was not for a public use or purpose; and that therefore, in thus authorizing cities to issue bonds of such a nature, and impose taxes for their payment, the general assembly exceeded its legislative power. To what extent the restraining effect of that constitutional limitation is not applicable to taxation, we need not here consider. By section 1 of article 2 of the constitution, “The legislative power of this state shall be vested in a general assembly, which shall consist of a senate and house of representatives.” The power to tax which exists in the state as a part of its inherent sovereignty, is a legislative power. In the apportionment of power between the legislative, executive and judicial departments of the government, the authority, to tax necessarily falls to the legislative; *132 and as a general rule, the taxing power has been treated by the judiciary as vested in the discretion of the legislative bodies. Taxes being a grant of the people who are taxed, the grant should be made by the immediate representatives of the people. But, while the legislative branch of the government has the exclusive power of taxation, it may, when there is no special constitutional restriction, delegate the taxing power to municipalities in such measure as it deems expedient — in other words, with such limitations as it sees fit, as to the rate of taxation, the public purposes for which it is authorized, and the objects which shall be subjected to taxation ; but it cannot confer any greater power than the state itself possesses, and it must observe the restrictions and limitations of the organic law. Dillon Mun. Corp, § 740, and cases cited. In the absence of such restrictions, either expressed or obviously implied in the constitution, it does not belong to the judicial department of the government to furnish redress against an exercise of legislative discretion. As said by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 430, it is “ unfit for the judicial department to inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power.” And in another case, the same eminent judge has said, “ The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all, for the benefit of all..... This vital power may be abused; but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security, where there is no express contract, against unjust and excessive taxation; as well as against unwise legislation generally.” Providence Bank v. Billings, 4 Pet. 514, 563. And futhermore, when the judicial department is invoked to determine whether a legislative enactment for the imposition of taxes is inoperative and void as being repugnant to the constitution of the state, every presumption and intendment is in favor of the constitutionality of the enactment, and the courts will not *133 be justified in pronouncing it invalid, unless satisfied beyond a reasonable doubt of its repugnance to the constitution. And nothing but a clear violation of the constitution — a clear usurpation of power prohibited — will warrant the judiciary in declaring an'act of the legislative department unconstitutional and void. Am. & Eng. Ency. of L., vol. 3, p. 673, and cases cited.
By the constitution of this state, the general assembly .is required to provide for the organization of cities, and incorporated villages, by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power. But to what extent the power of municipal taxation should be restricted so as to prevent an abuse of such power, the constitution has not in express terms definitely prescribed. By a special constitutional restriction, the general assembly cannot authorize any county, city, town, or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or-loan its credit to, or in aid of, any such company, corporation, or association. But, the act under which the city of Toledo claims the right to issue its bonds, in aid of supplying the city and its citizens with natural gas for public and private use and consumption, does not purport to authorize any municipality to exercise any power that comes within the constitutional inhibition last referred to. Nor do we find elsewhere in the constitution, any express prohibition that might be construed as restraining the legislature from authorizing municipalities to issue its bonds, for the purpose above designated, and impose taxes for their payment.
But though there be no express prohibition, it has been decided in C., W. & Z. Railroad Co. v. Commissioners of Clinton County, 1 Ohio St. 77, that any act passed by the general assembly not falling fairly within the scope of “ legislative authority,” is as clearly void as though expressly prohibited. It will be conceded that some acts of legislation need not be expressly excepted from the legislative power, because they *134 do not pass to the general assembly by the general grant of legislative power. A prohibition therefore ig not necessary. Sharpless v. Mayor of Philadelphia, 21 Pa. St. 147. “ Some of these limitations of legislative authority are prescribed by constitutions, but others spring from the very nature of free governments. The latter must depend for their enforcement upon legislative wisdom, discretion, and conscience. The legislature is to make laws for the public good, and not for the benefit of individuals.” Cooley on Con. Lim., 152 (6 ed.). Taxation implies an imposition for a public use. The burdens or charges imposed by the legislature or under its authority, in the shape of taxes, upon persons and property, are to raise money for public as distinguished from private purposes. But, what are public purposes, is a question that must be left to the legislature, to be decided upon its own judgment and discretion. And the discretion in that regard vested in the legislature, cannot be controlled by the courts, except perhaps when its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful. Cooley on Con. Lim., supra.
We are brought now to the question, whether the authority given to Toledo and other cities, to issue natural gas bonds, and levy taxes to pay them, was for a purpose of so public and general a nature, as not to transcend the legislative power vested in the general assembly. In holding that there can be no lawful tax which is not imposed for a public purpose, the line of demarcation is by no means clear and distinct, and well defined, between what is for public, and what for private purposes. It would be exceedingly difficult to lay down any general principle, or construct any formula, by which each case, as it arises, may be assigned to the one or the other side of the line. There are, however, certain objects, the promotion of which, by reason of their being treated as of general necessity, has been decided to be a public use or purpose. Thus, it is now the well-settled doctrine throughout the several states, that the business of public highways, turnpikes, bridges, canals, and other public means for travel and for the transportation of goods, are a public use *135 within the constitution. The objects and business of aqueduct and water-works companies, for the supply of cities and their inhabitants with water, are a public use. Reddall v. Bryan, 14 Md. 444; Burden v. Stein, 27 Ala. 104; Lumbard v. Stearns, 4 Cush. 60; Mayor, etc., v. Bailey, 2 Denio, 433, 452, per Gardiner, President. The sewerage of a city is also held to be a public use. Hildreth v. Lowell, 11 Gray, 345. Land taken in a city for public parks and squares, by authority of law, whether advantageous to the public for recreation, health or business, is deemed to be taken for a public use. Matter of Commissioners of Central Park, 63 Barb. 282. And in Bloomfield, etc., Natural Gas Light Co. v. Richardson, 63 Barb. 437, the corporation undertook to conduct the natural gas flowing from a gas spring or well to the city of Rochester, a distance of about thirty miles. The case, it is true, involved the right of eminent domain and not taxation, but in a proceeding to acquire the right of way for its mains through the lands of private owners, and to appoint commissioners of appraisal, it was held that the purposes, object and business of the corporation were a public use within the meaning of the constitution.
In the present controversy, the object proposed is, to supply the city and the citizens of Toledo with natural gas “ for public and private use and consumption.” The terms employed to define the object are comprehensive. Whether for fuel or as an illhminant, the design is to furnish gas for all public buildings, and for the private consumption of the community at large. The expense of the undertaking is not to be incurred in behalf of a favored class of citizens, or to foster certain branches of industry, but for the benefit of all the inhabitants of the city. If natural gas is thereby made cheap, or cheaper than before, to consumers, such an advantage will inure to any and all who may avail themselves of the privilege of using it. Nor does their use of it necessarily imply taxation for the payment of the principal and interest of the bonds issued by the municipality, as the income derived from the consumption of natural gas might prove fully adequate to such payment.
*136 Water, light and heat, are objects of prime necessity. Their use is general and universal. It is now well settled, that the legislature in the exercise of its constitutional power may authorize cities to appropriate real estate for waterworks ; and levy and assess upon the general tax list an assessment on all taxable real and personal property in the corporation, for the payment of the cost and repair of such water-works; and for the purpose of paying the expenses of conducting and managing the works, a water rent may be assessed upon all tenements and premises supplied with water. And yet, in cities and towns where there are public water-works, there are often large numbers of the inhabitants who do not connect their dwellings or business establishments with the water pipes laid in the streets, and who rely for their supply of water upon- the ordinary methods and sources. They are taxed, nevertheless, for the construction of works of which they may have no immediate need to avail themselves, but such works meet the wants of the rest of the community. And, as a protection from fire — as a means for the preservation of health — to supply an article of convenience and necessity to the great body of'the citizens, for domestic uses, for operating manufacturing establishments, for heating houses, for generating steam in all its varied applications, municipalities incur debts and levy taxes for constructing and maintaining expensive water-works. The benefits and conveniences offered may not be embraced by all, but they are notwithstanding designed for the general advantage, and subserve what is recognized as a public purpose. The city, in its corporate capacity, does that for the citizen which he could never accomplish by his individual effort, and leaves it to his option to accept or dispense with the privilege offered.
What we have said in reference to water-works is, for the most part, applicable to the erecting and maintaining of natural or artificial gas-works. In State ex rel. v. The City of Hamilton, 47 Ohio St. 52, the city issued its bonds for the purpose of erecting artificial gas works, and furnishing the public lighting for the city. This court held in that case, *137 that the city was empowered to erect its own gas works at the expense of the corporation. It did not become necessary to decide whether, by virtue of the sections of the Revised Statutes then under consideration, the city would be ' authorized to construct its own gas works, and furnish gas to the inhabitants for private consumption. That question has been argued in the case at bar, by relator’s counsel in The State of Ohio ex rel. v. The City of Hamilton, now pending in this court, on brief filed in the last entitled case. But, as throwing light, upon the present investigation, and as an authority entitled to the highest respect, we must acknowledge the force of the language used in the Opinion of the Justices of the Supreme Court to the House of Representatives, 150 Mass. 592, 597. In rendering the opinion that the legislature has the power under the constitution to authorize the cities and towns within the commonwealth to manufacture and distribute gas or electric light for use in their public streets and buildings,* and for sale to their inhabitants, it is said: “ If gas or electricity is to be generally used in a city or town, it must be furnished by private companies or by the municipality, and it cannot be distributed without the use of the public streets, or the exercise of the right of eminent domain.....If the legislature is of opinion that the common convenience and welfare of the inhabitants of cities or towns will be promoted by conferring upon the municipalities the power of manufacturing and distributing gas or electricity for the purpose of furnishing light to their inhabitants, we think that the legislature can confer the power.”
Heat being an agent or principle indispensable to the health, comfort and convenience of every inhabitant of our cities, we do not see why, through the medium of natural gas, it may not be as much a public service to furnish it to the citizens, as to furnish water. It is inquired, why do not municipalities also purchase coal mines, and issue their bonds therefor, and embark in the business of mining and selling coal to private consumers ? An obvious reply is, that coal and other fuel may be carried to the consumer by the *138 ordinary channels of transportation, and at comparatively moderate expense, while in conveying natural gas, streets must be opened, pipes laid, works erected, fixtures and machinery purchased, and other expenses incurred, beyond the enterprise and capital of an individual.
The objection that a work or undertaking prosecuted by a city, at the public expense, does not benefit some individuals, will not deprive it of the character of a public service or of an object for public purposes. Some individuals, as we have before suggested, may be incidentally benefited more than others ; and some, from their place of residence in a city, may not use the work at all. It is sufficient “ if every inhabitant who is so situated that he can use it, has the same right to use it as the other inhabitants.”
The source of supply of natural gas to the people of Toledo, it is said, is beyond the corporate limits; but the right of a city to aid in the construction of public works, is not necessarily confined to those works which are within the locality whose people are to be taxed for them. It is the corporate interest of the city which determines the right to tax her people, and not the location of the public improvement. Sharpless v. The Mayor of Philadelphia, supra.
It is conceded that if the act of January 22, 1889, had authorized cities to procure natural gas solely for their own use and consumption — or for use only in public buildings and places — it would not be open to constitutional objection; but as the act provides for supplying cities and the citizens «thereof with natural gas for public and private use and consumption, it is urged, that the manifest design of the act, is to enable the city to furnish fuel to individual consumers for private use, at a cheaper rate than they could obtain it from other sources, and that such being its main object, the city cannot exercise the taxing power in promoting a purpose that is essentially private as distinguished from one that is public. We do not so read the act. In our view, it may as well be urged, that to supply the city and public buildings with natural gas was the primary object of the act, and the fur nishing of it to citizens merely incidental thereto, as that to *139 supply individuals was the primary object, and the supplying of the city and public buildings only incidental. But, granting that it entered into the design of the legislation to cheapen the price of natural gas, it was to cheapen it for all the inhabitants of the city, and that fact would become significant as rendering the public purpose of the act more useful and effective.
There is a class of cases to which our attention has been called, in which are considered the legislative authority under the constitution, to pass laws enabling cities to assist individuals or corporations, to establish or carry on manufacturing of various kinds within or without the corporate limits. But, those cases bear but a slight analogy to the one before us. Among them, and of a cognate character, is that of Loan Association v. Topeka, 20 Wall. 655. In that case, The Citizens’ Savings & Loan Association, of Cleveland, brought their action in the court below, against the city of Topeka, on coupons for interest attached to bonds of that city. The bonds on their face purported to be payable to The King Wrought-Iron Bridge Manufacturing and Iron-Works Company, of Topeka, to aid and encourage that company in establishing and operating bridge shops in the city of Topeka. The city issued one hundred of those bonds for $1,000 each as a donation to encourage that company in its design of establishing a manufactory of iron bridges in that city. It was properly held, that there was no power in the legislature to pass a statute authorizing the levy of taxes in aid of such a purpose. The avowed object in issuing the bonds was to aid a private enterprise — to promote the interests of a private company designated by name, and singled out from all others. When the legislature authorized the city to contract the debt, the authoi'ity was implied to levy such taxes as were necessary to pay the debt. The .authority was thus given, under the guise of taxation to pay the bonds, to reach the property of the citizens and use it in aid of a private manufacturing company. The benefit accruing to the public, if any, was at most incidental, and might prove to be remote and speculative. The proprietors of the iron-works were under no legal obli *140 gations to render any duty or service whatever to the municipality or state. Nor could the state or city compel them to complete or operate the works, or prevent their removal at pleasure to some other locality.
The natural gas works for which Toledo has issued its bonds, are owned and controlled by the municipality, and not by individuals. But every citizen, as a member of the community, has an interest in their construction, management and maintenance. The advantage resulting from them is tendered on equal terms to every inhabitant of the city. And the terms and conditions upon which the benefits are to be enjoyed by the whole people, are dependent largely upon the actioii of the people themselves. In our judgment, the taxation authorized by the general assembly for the payment of the bonds issued, was in no wise to subserve a private purpose, when used as language of constitutional limitation. The establishment of natural gas works by municipal corporations, with the imposition of taxes to pay the cost thereof, may be a new object of municipal policy. But, in deciding whether in a given case, the object for which taxes are assessed is a public or private purpose, we cannot leave out of view the progress of society, the change of manners and customs, and the development and growth of new wants, natural and artificial, which may from time to time call for a new exercise of legislative power. And, in deciding whether such taxes shall be levied for the new purposes that have arisen, we should not, we think, be bound by an inexorable rule that would embrace only those objects, for which taxes have been customarily and by long course of legislation levied.
It is urged in behalf of the relator, that the act enabling the city of Toledo to construct natural gas works, for supplying the city and citizens thereof with natural gas for public and private use, impairs the obligation of a contract between the city and The Northwestern Ohio Natural Gas Company. The common council by ordinance granted to that company the right to lay, maintain, and operate its gas pipes in the city for heating and power purposes. By a *141 subsequent ordinance, passed July 5,1887, the council fixed the price of natural gas for the period of three years from the passage of the ordinance, and enacted that the council should not for that period, by ordinance or otherwise, require the company to furnish gas at a price lower than that named in the ordinance. But, there was a proviso, that nothing in the ordinance contained, should be construed as granting to existing companies any exclusive rights or privileges, or prevent any other company from furnishing natural gas to the citizens of Toledo. The' act of the legislature did not purport, nor did it operate to deprive the company of the benefit secured by the ordinance, that for three years, it should not be required to furnish gas at a lower rate than that specified.
It is contended however, that there was an implied contract between the company and the city, that the latter would not enter into competition with the company in supplying natural gas to private consumers. We see no ground for the implication, that the municipality, by its ordinances or otherwise, had, as against itself and its citizens granted such a monopoly to that company. While it is conceded, that by the terms of the ordinance, any other company would not be prevented from furnishing natural gas to the citizens, yet, as against the city, it is claimed, that The Northwestern Ohio Natural Gas Company obtained the exclusive right to use the streets of the city, in perpetuum, for the purpose of supplying -natural gas to the citizens. The city, it is said, might lay its pipes, and construct its works for conveying natural gas into all public buildings and institutions; but it has no longer any right to use its streets for supplying natural gas to its citizens, and any act of the legislature which professes to clothe the municipality with such power, is in conflict with the constitution and void. We do not think the municipality and its citizens can be thus shorn of their rights. If under the constitutional grant of legislative power to the general assembly, the city of Toledo could be given authority — as in our opinion it could be — to furnish natural gas for public and private use, as provided by the act of J anuary 22, *142 1889, we must reach the conclusion, in accordance with the principles stated in State ex rel. v. City of Hamilton, 47 Ohio St. 52, that no vested right has been taken away from the company, nor has the obligation of any contract between it and the city been impaired by the act of the legislature.
In addition to the questions which we have thus far considered, there are others presented on the record, which we have also examined; but we have discovered no good grounds for ousting and excluding the defendant, as prayed in the petition, from the privilege and franchise of issuing and selling its bonds, and engaging in the enterprise authorized by the act of the general assembly.
Judgment for defendant, and petition dismissed.